FAULKNER ET AL., APPELLEES AND CROSS-APPELLANTS, v.
PEZESHKI, APPELLANT AND CROSS-APPELLEE.

[Cite as Faulkner v. Pezeshki (1975), 44 Ohio App. 2d 186.]

(No. 963—Decided April 29, 1975.)

*Messrs. Volkema, Post & Pees*, for appellees.
*Messrs. Bannon, Howland, McCurdy & Dever*, for appellant.

GRAY, J.  Plaintiffs, the appellees, filed a complaint charging defendant with malpractice. A jury returned a verdict in favor of plaintiff. Defendant filed his notice of appeal alleging the following errors:

"(1) The Trial Court erred in permitting the testi-

mony of Dr. Michael Stryker and Dr. James Hardy as to malpractice.

"(2) The Trial Court erred in charging upon the doctrine of res ipsa loquitur and ordinary care, when the same was not pleaded nor applicable.

"(3) The Trial Court erred in permitting the jury to consider whether the defendant had instructed the plaintiff as to post-operative care.

"(4) The Trial Court erred in overruling defendant's motion for directed verdict at the close of plaintiff's evidence and at the close of all the evidence.

"(5) Other errors of the Trial Court apparent on the face of the record."

Plaintiffs also filed their notice of cross-appeal assigning the following errors:

"1. In a personal injury claim where expert evidence is adduced to the effect that the plaintiff has a permanent injury which will in the future cause symptoms of 'fatigue and low-grade fever' as a result of the negligence complained of, it is error for the trial court to refuse to charge the jury that the plaintiff was entitled to recover compensation for future pain and suffering.

"2. The court erred in withdrawing from the jury's consideration the issue of lack of informed consent at the close of the plaintiffs' case and in refusing to instruct on said issue at the close of all evidence."

The medical history of the patient, Sandra Faulkner, is as follows: She was 29 years of age at the time of trial and in October 1970 she delivered her fourth child. She had a pap smear test and she tested Class III—cancer. She was admitted to the hospital in Portsmouth and underwent a D & C and conization with the finding of an in situ carcinoma of the cervix. Later, on February 22, 1971, she returned to the hospital and had a total abdominal hysterectomy performed. The pathology reports from this operation demonstrated no residual malignancy. The post-operative course in the hospital was quite stormy, she had a vaginal discharge and fever. However, she responded to antibiotics and was finally released from the hospital. After her re-

lease she persisted in having a vaginal discharge which was watery in type. All of the above occurred while she was a patient of the defendant. The patient was seen in March 1971, approximately, by Dr. Appleton who practices in Portsmouth, Ohio. Up until this time she was a patient of the defendant. He had a catheter placed in her bladder, but despite the catheter being in place she had a watery leakage from the vaginal area. In the meantime she developed an inflammatory rawness that developed in the skin posterior to the vaginal orifice, which in medical terms is called the perineum. She was also placed on a drug at that time by Dr. Appleton but in spite of this medication developed chills, fever, nausea, vomiting, headache and back pain. On March 27, 1971, she was again admitted to the hospital for further treatment for these conditions. At this time of her hospitalization, her temperature was elevated and her perineum was excoriated, which was a urine type burn. A palpable fistula in the anterior wall of the vagina was found. Her white blood count was elevated. Her vaginal drainage was cultured and it demonstrated bacterial growth, Klebsiella and streptococcus faecalis. She received treatment with antibiotics including Keflex to which she had a good response. The next hospitalization was April 8, 1971, and she entered the hospital with fever, chills, left flank pain and this was diagnosed as acute pyelonephritis. Her temperature on admission to the hospital was 104°. Her pulse was abnormal and was markedly elevated. The fistula which had been previously present was again noted. She had an intravenous pyelogram which demonstrated bilateral dilation of the collecting system, most marked on the left. On April 18, 1971, the retrograde pyelography demonstrated that there was an apparent obstruction to the left ureter. This obstruction being somewhere near the ureteral pelvic junction. The right retrograde was within normal limits. At that time the patient underwent a left ureteroneocystostomy and the post-operative result was excellent. This operation was performed by Dr. Walker. She had no more leakage of urine through the vagina. Her course to recovery remained smooth. She was discharged May 4, 1971.

The record shows that there was a stump of the left ureter in the bladder and this was obstructed approximately 3 centimeters beyond the bladder. The record further developed that she had pyelonephritis which evidently left her with a chronic kidney infection. Other results of the surgery performed by the defendant was the vaginal draining of urine resulting in the excoriation of the perineum. Expert medical testimony attributed this condition to the carelessness of the surgery in the performance of the hysterectomy by the defendant. Further medical testimony attributed the urine drainage into the vagina as causing an ureterovaginal fistula which was established during the performance of the hysterectomy by defendant. In addition to the above, she had a low grade fever and did not feel well, being tired and fatigued. It was further testified to by an expert witness that the last two hospitalizations of Sandra were due to the prior careless surgery of the defendant.

We will consider defendant's claimed errors first.

In reviewing the question whether error intervened in the reception of the testimony of expert witnesses for lack of sufficient qualifications, it must be borne in mind that the court's determination will ordinarily not be reversed unless there is a clear showing that the court abused its discretion. *Ohio Turnpike Commn.* v. *Ellis* (1955), 164 Ohio St. 377.

There has developed in malpractice actions, generally, what is known as the "locality rule," in considering the qualifications of an expert witness who has offered to testify upon the medical standards that should have been observed in a particular case. Such rule developed in early years upon the theory that doctors in a rural area should not be held to the same standards of medical expertise as doctors in urban areas because of difficulties of communication, travel with restricted opportunities to be kept abreast of medical advances and the necessity of practicing in often inadequate hospital facilities. For a leading case developing the rule, see *Small* v. *Howard* (1880), 128 Mass. 131. Basically, four standards are involved: (1) the standard used in the community in which the defendant practices, (2) the standard used in a similiar community, (3) one followed in

the vicinity where the physician works, or (4) one based upon general professional practice, rather than a practice limited to a specific geographic locality, with community practice bearing on the issue of due care. As a consequence, expert witnesses are qualified only if they possess the requisite familiarity with the applicable proper standard, local, similar or vicinity, since the jury will be instructed as to such standard. See annotation, 37 A. L. R. 3d 420, 422.

The locality rule is being increasingly erroded by judicial decisions, as being antiquated in light of present day means of communication, travel and the techniques available to the medical profession to keep abreast of modern developments. See *Brune* v. *Belinkoff* (1968), 354 Mass. 102, 235 N. E. 2d 793; *Pederson* v. *Dumouchel* (1967), 72 Wash. 2d 73, 431 P. 2d 973.

In examining the Ohio authorities, it appears arguable that there are two views deducible from the cases. The first paragraph of the syllabus in *Gillette* v. *Tucker* (1902), 67 Ohio St. 106 reads:

"A surgeon and physician, employed to treat a case professionally, is under an obligation, which the law implies from the employment, to exercise the average degree of skill, care and diligence exercised by members of the same profession, practicing in the *same or a similar locality,* in the light of the present state of medical and surgical science; and that he will indemnify the patient against any injurious consequences which may result from his want of ordinary skill, care and attention in the execution of his employment." (Emphasis added.)

See, also, 42 Ohio Jurisprudence 2d 636, Physicians and Surgeons, Section 116, and additional authorities therein cited.

In the case of *Ault* v. *Hall* (1928), 119 Ohio St. 422, the Ohio Supreme Court embodied, in the seventh paragraph of the syllabus, the proper instruction that should be given in malpractice actions. The paragraph provides:

"In an action against a surgeon for malpractice the jury should be instructed that the plaintiff must show by a preponderance of the evidence and the jury must find that

the defendant in the performance of his service either did some particular thing or things that physicians and surgeons of ordinary skill, care and diligence would not have done *under the same or similar circumstances*, or that the defendant failed or omitted to do some particular thing or things which physicians and surgeons of ordinary skill, care and diligence would have done under the same or similar circumstances.'' (Emphasis added.)

One of the issues in *Ault* was whether a surgeon could present as a complete defense to a malpractice action, wherein a sponge had not been removed after an operation, reliance upon the customary practice in Cleveland, Ohio and vicinity of relying upon a nurse's sponge count.

In the opinion, the court said, at 438:

''The subject of custom, in the technical sense of usage which has attained the force of law, is not involved in this proceeding. We have before us nothing more than an attempt to show the usual method or system of doing a practical thing which must necessarily be done in some way, and may be done in a variety of ways. Surgical science should be commended for the practice of having a nurse whose special task is to account for sponges, but it ought to be severely condemned if it places sole reliance upon that practice. The duty of a surgeon to exercise care cannot be delegated to another, without recourse. Custom will not justify a negligent act or exonerate from a charge of negligence. Long continued careless performance of a duty by any trade, business or profession will not transform negligence into due care. Usage cannot avail to establish as safe in law that which is dangerous in fact. We therefore hold both upon reason and authority that the test of the usage or practice of having a sponge nurse count the sponges is competent as reflecting upon the care and diligence of the surgeon, but that reliance upon such custom alone is not a complete defense to the charge of negligence.''

Noting that the court did not include in the charge it deemed proper in such an action a standard of care based upon a community or similar community standard, the decision can be interpreted as a rejection of the locality rule,

compliance with local standards being only a factor for the jury in determining whether due care was observed. It is apparent that the Eighth District Court of Appeals in *Morgan* v. *Sheppard* (1963), 91 Ohio Law Abs. 579, so interpreted *Ault* in holding that interrogatories to the jury as to "the recognized standard in this and similar communities" should not be submitted to a jury. See, also, *Hier* v. *Stites* (1914), 91 Ohio St. 127, where a hypothetical question without reference to the local standard was held proper.

Irrespective of the continuing validity of the same or similar locality standard in Ohio, we are of the view that the standard should not exclude testimony of an expert witness where the standards to which he proposes to testify are minimum standards applicable wherever medicine is practiced. The question, to us, is not whether the proffered witness practiced in Portsmouth or a similar locality, but if he knows what the applicable standards are. See *Ardoline* v. *Keegan* (1954), 140 Conn. 552, 102 A. 2d 352. To the extent that minimum standards are involved, the standard of practice in Portsmouth and elsewhere are within his scope of knowledge. *Hundley* v. *Martinez* (1967), 151 W. Va. 977, 158 S. E. 2d 159; *Webb* v. *Jorns* (Tex. 1973), 488 S. W. 2d 407.

The question remains, however, irrespective of the locality rule, whether the proffered witness had sufficient training, experience and expertise to otherwise qualify. The reason for expert testimony is summarized in McCormick on Evidence 29, Section 13 (2d ed. 1972), wherein it is stated in part:

"An observer is qualified to testify because he has firsthand knowledge of the situation or transaction at issue. The expert has somethng different to contribute. This is a power to draw inferences from the facts which a jury would not be competent to draw. To warrant the use of expert testimony, then, two elements are required. First the subject of the inference must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman. * * * Second, the witness must have sufficient skill, knowledge or experience in

that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.''

The real test then is whether a particular witness offered as an expert will aid the trier of the facts in its search for the truth. It is a general rule that it is not required that such witness be the best witness on the subject. 2 Wigmore on Evidence 665, Section 569 (3rd. ed. 1940); *Fightmaster* v. *Mode* (1928), 31 Ohio App. 273. It has been stated that where opinion evidence is offered by a physician or surgeon, his competency is usually sufficiently attested to by the fact that he has been duly licensed to practice medicine or surgery. 31 American Jurisprudence 2d 629, Expert and Opinion Evidence, Section 105. Accordingly, the weight of authority is that a physician who is not a specialist will normally be permitted to testify in a malpractice action against a physician specialist. 61 American Jurisprudence 2d 343, Physicians, Surgeons, Etc., Section 206.

We recognize there are no ready litmus tests to apply respecting the qualifications of the proffered witness here, since the basis of the alleged negligent acts appear to involve basic medical standards to the proper manner of performing a hysterectomy. We are of the view that the witness had, by education, training and experience, sufficient expertise to aid the jury in its task of determining whether defendant was negligent. Admittedly, better witnesses may exist, but such fact should not have barred the testimony of the witness produced. Such deficiencies went to the weight of his testimony and not his competency.

The physician's duty to advise his patient as to consultation has been said to arise when the physician knows, or should know, that he does not possess the requisite skill, knowledge, or facilities to treat the patient's ailment properly, or that the method by which he is treating such ailment is not providing relief or effecting a cure.

Locating an expert to testify for the plaintiff in a malpractice action is known to be a very difficult task, mainly because in most cases one doctor is reluctant and unwilling to testify against another doctor. Although doctors may complain privately to each other about the incompetence

of other doctors, they are extremely reluctant to air the matter publicly. In addition to this, the law has established certain criteria that must be met before the testimony of plaintiff's expert will be admitted.

We now come to assignment of error No. 2. This assignment of error is really composed of two branches. Defendant claims that it is necessary for plaintiffs to plead *res ipsa loquitur*. This is not the law in Ohio now, nor has it been such for many years, if ever. In *Beeler* v. *Ponting* (1927), 116 Ohio St. 432 the Supreme Court said, in its syllabus:

"Where the facts and circumstances shown by the evidence in the trial of a negligent suit are such as would ordinarily call for the application of the doctrine of *res ipsa loquitur,* it is the duty of the trial court to charge upon that subject, but the omission to do so in the absence of a request of counsel for an instruction upon that subject is not reversible error."

At page 433 of the opinion, the court said:

"That doctrine [*res ipsa loquitur*] being a rule of evidence, it is not necessary to be pleaded * * *."

We now proceed to determine if such a charge should have been given.

We begin by reviewing certain principles applicable to the facts and law of this case. *Res ipsa loquitur* is a rule of evidence and the applicability to the case is normally determined at the conclusion of the trial. It is applied for the reason that the circumstances surrounding the case are peculiarly within the knowledge of the defendant and are unavailable to plaintiff.

The trial court gave a charge of conditional *res ipsa loquitur* which we believe is proper in this case. Without the aid of the doctrine, a patient who received permanent injuries of a serious character, obviously the result of someone's negligence, would be entirely unable to recover unless the doctors and nurses in attendance voluntarily chose to disclose the identity of the negligent person and the facts establishing liability. If this were the state of the law of negligence, the courts, to avoid gross injustice, would be forc-

ed to invoke the principles of absolute liability, irrespective of negligence, in actions by persons suffering injuries during the course of treatment under anesthesia. But we think this juncture has not yet been reached, and that the doctrine of *res ipsa loquitur* is properly applicable to the case before us.

The power of our court on review begins and ends with finding that the record contains some substantial evidence, contradicted or uncontradicted, which supports the conclusion reached by the jury. On defendant's appeal, the record before us must be read in the light most advantageous to plaintiffs, all conflicts must be resolved in their favor, and all legitimate and reasonable inferences must be indulged in to uphold the verdict, if that is possible.

Defendant claims that prejudicial error occurred when the court instructed the jury with regard to the duty of defendant to instruct his patient in post-operative care. We believe that the general rule is that it is the surgeon's duty, after his actual personal service is completed, to give to the patient proper instructions regarding the future treatment of the ailment, if it is not at that time completely cured.

We believe that some of the strongest evidence relating to the negligence of defendant and his lack of provision for the post-operative care of the patient is the fact that Dr. Walker, a short time later, diagnosed the condition of the patient and by surgery corrected the problem. It is obvious that defendant did not recognize the problem; hence, he could not have advised her concerning her post-operative care. This had to be done by another surgeon.

In the consideration of assignment of error No. 4, we find no prejudicial error. We desire to cite some fundamental propositions of law.

Where a physician sets his own standard of professional competence and testifies that he measured up to that standard, but the jury finds from other evidence that the physician failed to do that which he himself considers proper and necessary, the physician cannot complain that the plaintiff has not proved negligence.

Where the evidence in a civil case tends to sustain all

the essential elements in a plaintiff's case, it is error for the trial court to withdraw the case from the jury and direct a verdict for the defendant.

The Supreme Court, in *The Painesville Utopia Theatre Co.* v. *Lautermilch* (1928), 118 Ohio St. 167, said in the syllabus:

"Whenever, from conflicting evidence of the same witness or of different witnesses, it becomes necessary to weigh such conflicting evidence to determine wherein the probable truth lies, or from a combination of circumstances determine an utimate fact upon the determination of which different minds might reasonably arrive at different conclusions, it is the province of the jury to perform that function. It is reversible error for the court to invade that province of the jury."

Later the Supreme Court further said that if there is any substantial evidence to support the decision of the trial court, reviewing courts must affirm such decision. *In re Tilton* (1954), 161 Ohio St. 571, 577. An appellate court is not permitted to substitute its judgment for that of the trial court even if it is disposed to do so. *Trickey* v. *Trickey* (1952), 158 Ohio St. 9.

Our position can be stated thusly: Where a physician accidently severs a ureter of a patient during a hysterectomy and closes the wound without exercising some technique to determine the condition of the ureters, such is not an exercise of proper care by a surgeon performing such hysterectomy, and a finding by the jury that such conduct constitutes malpractice is based on ample evidence. The trial court was authorized to submit the question to the jury whether the surgeon was negligent or not.

One further fact must be recognized and discussed. While the damaged ureter was in the general area of the operation, it was in a healthy condition before the operation and not the subject of surgery, corrective or otherwise. The unusual injury to the left ureter and the consequent damage to the patient's body occurred while the patient was unconscious and in the course of medical treatment by the defendant who had control over her body and the instrumentalities which caused the injuries. Defendant is then properly called upon to meet the strong inference of neg-

ligence by giving an explanation of his conduct. It is very apparent that defendant failed to convince the jury of the rightness of his cause and as we have previously determined, that question was one for the jury.

We find no prejudicial error among those assigned and argued by defendant.

We now come to consider the first assignment of error of the plaintiffs, in their cross-appeal.

The trial court in its instruction to the jury said:

You will also consider whether such injury is permanent and if so, include reasonable compensation for such injury.''

Plaintiffs' counsel made the following request to the trial court after the charge was given to the jury.

''Mr. Pees: Your Honor, the plaintiff, for the record, requests that the jury be informed on the issue informed consent, for the reasons discussed in previous minutes, and request the court to instruct the jury on compensation for future pain and suffering as the evidence shows, for the reason there has been expert testimony she will have future pain and suffering, and fatigue, which expert diagnosed her having as a result of his incident, and plaintiff respectfully requests the court to instruct the jury it's an undisputed fact as a result of the hysterectomy there was some damage caused to the ureter of Sandra Faulkner, leaving for the jury to determine whether or not that damage was caused by negligence of the surgeon. And for the very reason those facts are undisputed. * * *''

At best, it can be claimed for plaintiffs that the court did not cover this point in the language desired by plaintiffs. The second paragraph of Civil Rule 51 (A) as amended in 1972 states:

''No party may assign as error the giving or the failure to give any instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.''

It should be noted that when this rule was amended in 1972 the word ''distinctly'' was changed to ''specifically''.

The Rules Advisory Committee Staff Note states:

"The second paragraph of Rule 51(A) has also been amended by providing that any objection to the court's instructions to the jury must be stated 'specifically'. The word 'specifically' emphasizes the need of the party objecting to the court's instructions to be exact and clear as to the nature of his objection. In addition he must set forth the 'grounds of his objection.' In short, a party who makes only a 'general' or 'vague' objection to the instructions may not later claim error." Cf. *Singfield* v. *Thomas* (1971), 28 Ohio App. 2d 185.

If defendant wanted to preserve his question for review, he should have requested an instruction that was strictly accurate and in the exact language in which he thought stated the exact proposition he wished to have the court present to the jury. *Railroad Co.* v. *Schultz* (1885), 43 Ohio St. 270. Compare *Jones & Co.* v. *Herbert* (1929), 7 Ohio Law Abs. 153; *Beach* v. *Chollett* (1928), 31 Ohio App. 8, 13; *Kopachy* v. *Blank* (1929), 7 Ohio Law Abs. 281; *Pletcher* v. *Bodle* (1933), 13 Ohio Law Abs. 708.

Considering plaintiffs' second assignment of error, we come to the conclusion that no prejudicial error occurred here. Plaintiffs, in their brief, state:

"Although plaintiffs respectfully submit that the trial court erred in refusing to permit informed consent to be an issue for the jury, it is necessary to concede at the outset that, unless this court reverses the judgment for the plaintiffs rendered in the trial court, the error claimed herein would be non-prejudicial."

Due to this concession on the part of plaintiffs, and further due to the fact that this court did not reverse the judgment of the trial court, this question is not before us. We wish to add that what we have said in regard to assignment of error No. 1 could be applied with equal force to assignment of error No. 2. The assignments of error of plaintiffs are overruled.

The judgment is affirmed.

*Judgment affirmed.*

ABELE, J., concurs.

STEPHENSON, P. J., concurs in the judgment only.