TURNER, a minor, et al., Appellants,

v.

CHILDREN'S HOSPITAL, INC. et al., Appellees.

[Cite as *Turner v. Children's Hosp., Inc.* (1991), 76 Ohio App.3d 541.]

Court of Appeals of Ohio,
Franklin County.

No. 91AP–71.

Decided Dec. 19, 1991.

542

Miller & Dye Co., L.P.A., and David A. Dye; William A. Goldman; Schulman, Falvey & Buric and Allen Schulman, for appellants.

Vorys, Sater, Seymour & Pease, Alan T. Radnor and Carl D. Smallwood, for appellees Children's Hospital, Inc. and Annemarie Sommer, M.D.

Jacobson, Maynard, Tuschman & Kalur Co., L.P.A., David C. Calderhead and Patrick F. Smith, for appellee J. William Rupp II, M.D.

---

PETREE, Judge.

This is an appeal from the Franklin County Court of Common Pleas which granted summary judgment to defendants in this medical malpractice action. Plaintiffs present the following assignment of error:

"The trial court erred in granting defendants' motions for summary judgment, in that material issues of fact did exist, and defendants were not entitled to judgment as a matter of law."

Pertussis, or whooping cough, is an infectious disease which is particularly dangerous to young children. Accordingly, physicians today routinely administer diphtheria, pertussis, and tetanus ("DPT") vaccine to children in the first several years of life. In Ohio, proof of DPT immunization pursuant to a schedule of inoculations established by public health authorities is required before a child can attend school. R.C. 3313.671(A). However, some scientific evidence and expert opinion holds that a small percentage of children, perhaps one in thousands or hundreds of thousands, may suffer severe adverse consequences from the pertussis component of the drug. Both the drug manufacturer's package insert warnings and leading treatises on pediatrics indicate that the drug is contraindicated in children with "evolving" seizure disorders.[1]

---

1. There is substantial disagreement in the record on the proper diagnosis of an evolving, as opposed to a static, seizure disorder. A "static seizure disorder" has been defined in the record as one in which the physician can establish a cause of the seizures, like birth defect or trauma. An "evolving seizure disorder" has been defined in the record as one in which the cause is not ascertainable and which is progressing. Some expert opinion suggests that symptoms such as fever, somnolence, rash, and convulsions occurring up to a week after the shot, with no other explanation, mean that an evolving seizure disorder is present and DPT is contraindicated. Other expert opinion suggests that such symptoms must occur within seventy-two hours of inoculation.

Tiffany Nicole Turner was born to Todd and Sandra Turner on September 28, 1978 after an uneventful pregnancy. At the time, Dr. J. William Rupp was the Turner's family physician. After examining Tiffany and finding her development normal, Dr. Rupp gave Tiffany her first routine DPT shot on November 7, 1978. Five days later, Mrs. Turner contacted Dr. Rupp about Tiffany. She told the doctor that Tiffany had experienced episodes of jerking activity earlier in the day. So, Dr. Rupp told Mrs. Turner to bring Tiffany to his office. That very evening he examined her and took a history from Mrs. Turner. She described two episodes of jerking activity which consisted of stiffening of the torso and rhythmical jerking of the baby's extremities. Dr. Rupp's diagnosis of exclusion was: "rule out seizure disorder, rule out meningitis." He instructed Mrs. Turner to take Tiffany to the emergency room of Children's Hospital immediately.

At Children's Hospital, which is a teaching facility, Tiffany was examined by several doctors. The initial or differential diagnosis prepared by a fourth-year medical student reads:

"(1) *Seizure disorder*

"(a) Metabolic

"(b) CNS [Central Nervous System]

"(c) Trauma

"(2) Infection of CNS

"(3) Neonatal Seizure—unlikely. Child is somewhat old.

"(4) Toxin

"(5) *Reaction to DPT—Very unlikely this late.*" (Emphasis added.)

Since Dr. Rupp did not have staff privileges at Children's Hospital, Dr. Annemarie Sommer, a pediatrician specializing in genetics, served as the attending physician responsible for Tiffany's care. Dr. James M. Highley, an intern serving his residency, was responsible for the daily routine care of Tiffany. Dr. David S. Bachman, a board-certified pediatric neurologist, was called in for consultation on the seizure problem.

Throughout her fifteen-day hospitalization, Tiffany continued to exhibit some seizure activity, even though Dr. Bachman administered anticonvulsant Phenobarbital as a control measure. His initial diagnosis was that Tiffany had a seizure disorder of unknown etiology. This means that the doctor did not know the medical cause of the seizures.

Tiffany was discharged from Children's Hospital on November 28, 1978. The discharge summary signed by Dr. Sommer indicated a diagnosis of "seizure disorder." There was no mention of DPT. Upon discharge, the

parents were instructed to make follow-up visits with Drs. Bachman and Highley, which they did. At the time, Mrs. Turner reported that Tiffany was having about one seizure per day. Tiffany was kept on medication to control the seizures.

Tiffany was then brought to Dr. Rupp for a follow-up visit on January 1, 1979. Mrs. Turner reported that Tiffany's seizures had gotten worse, as she now experienced three short seizures a day. But Dr. Rupp did not conclude that the baby was abnormal. He continued her on the medications suggested by Dr. Bachman and instructed Mrs. Turner to return her to him in one month.

Sometime prior to February 1, 1979, however, Tiffany's parents decided to change physicians. Mrs. Turner wrote Dr. Rupp and informed him that they decided to have their long-time physician, Dr. Thomas E. Pappas, a family practitioner, take charge of the care of Tiffany. She requested that Dr. Rupp send Tiffany's medical records to Dr. Pappas and he did this.

On February 1, 1979, Dr. Pappas saw Tiffany at a time when she was four months of age. She was brought in with a fever and diarrhea. Dr. Pappas noted that Tiffany had a history of generalized seizures which began at six weeks of age. He also noted that she had previously been admitted to Children's Hospital, was "worked up" by Dr. Bachman, and was cared for by Dr. Rupp. Dr. Pappas also charted that the baby's seizures had been under good control for about two weeks.

On February 16, 1979, Dr. Pappas saw Tiffany for a check-up. He noted that Tiffany's seizures were now occurring only once a day. But otherwise, her condition was not remarkable. She was a happy, cheerful infant with good motor strength. He then administered Tiffany's second routine DPT shot along with a second Sabin polio vaccine. Five days later, Tiffany was taken to Dr. Bachman. He noted on his chart that while the child's seizures had been controlled until recently, she had " * * * broke through a little bit * * *." The doctor communicated this to Dr. Pappas by letter.

Tiffany received a third DPT shot from Dr. Pappas on May 2, 1979. Five days later, Mrs. Turner brought Tiffany back to Dr. Pappas because the child began running a temperature of between 102 and 104 degrees for four days after the shot. Further, the child developed a rash. Dr. Pappas thought the rash was consistent with roseola, a skin condition.

Tiffany received her final DPT shot on June 4, 1980. Mrs. Turner informed Dr. Pappas that Tiffany had been diagnosed as "physically retarded." He noted in his chart that the child appeared happy but had no awareness of him or her mother.

Tiffany's awareness has not improved since, as she is permanently brain damaged. Presently, she functions at the level of a four- or five-month-old child and is profoundly retarded. She currently experiences several grand mal seizures per week, jerking violently and screaming.

On March 8, 1988, Todd, Sandra, and Tiffany Turner filed suit against Children's Hospital; Dr. Bachman and his practice, Neurological Associates, Inc.; Dr. Pappas and his practice, Pappas and Freeman, Inc.; Dr. Rupp; Dr. Sommer; and Dr. Highley. In their complaint, plaintiffs alleged that the defendants committed medical malpractice in connection with the administration of the DPT vaccine to Tiffany in 1979. On June 20, 1990, the trial court granted summary judgment to defendants Dr. Rupp, Dr. Sommer, and Children's Hospital. Drs. Bachman and Pappas settled the case with plaintiffs and were dismissed with prejudice. Plaintiffs voluntarily dismissed Dr. Highley with prejudice.

In its decision, the trial court rejected the plaintiffs' theory that either Dr. Rupp or Dr. Sommer had a duty to warn Dr. Pappas that DPT was contraindicated in Tiffany's case. The court found it undisputed that Dr. Pappas was aware of Tiffany's seizure disorder, had a full history of the child's problems taken during hospitalization, was very experienced in administration of the vaccine, and was familiar with the DPT package insert providing that DPT is contraindicated in children with evolving seizure disorders. The court said that it was Dr. Pappas's "sole duty" to assess the risks of further inoculation, inform the parents of those risks, and decide whether the shot was contraindicated. The court reasoned that if Dr. Pappas wanted to learn more about which possible causes had been excluded at Children's Hospital, it was his duty to contact the physicians involved. The court further reasoned that the law should not impose a duty to warn subsequent physicians of matters that they should know because such a duty would create an unreasonable burden on the medical profession. The court made an analogy to the products liability law "learned intermediary" doctrine which is predicated on the special role of the prescribing physician in administering drugs and in disseminating drug information. Lastly, the court concluded that in any event Dr. Pappas's decision to inoculate the child was an intervening cause.

■■■ In Ohio, medical malpractice is a tort arising from the contractual relationship between physician and patient. Absent some express promise, the physician is not an insurer of patient recovery or guarantor of results. *Bowers v. Santee* (1919), 99 Ohio St. 361, 124 N.E. 238. As part of the contract between the physician and patient, the law implies that the physician possesses the ordinary knowledge and skill of the profession and the law imparts the duty on the physician to employ reasonable care and diligence in

the exercise of such skill and knowledge. There is no presumption of malpractice from the mere fact of injury. *Ault v. Hall* (1928), 119 Ohio St. 422, 429, 164 N.E. 518, 520. Rather, in order to establish malpractice, the plaintiff must demonstrate by a preponderance of the evidence that the injury complained of was caused by a practice that a physician of ordinary skill, care, or diligence would not have employed, and that plaintiff's injury was the direct and proximate result of such practice. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673, paragraph one of the syllabus. Proof of malpractice thus requires evidence of the pertinent recognized standard of the medical community and that the physician negligently departed from that standard. *Id.* at 131, 75 O.O.2d at 186–187, 346 N.E.2d at 677.

▮ Ordinarily, the issue of whether the physician has employed the requisite care must be determined from the testimony of experts, unless the standard of care is sufficiently obvious that laymen could reasonably evaluate the physician's conduct. *Id.* at 132, 75 O.O.2d at 187, 346 N.E.2d at 677–678. Such expert testimony serves to aid the trier of fact in determining if there was malpractice. For, although customary practice is evidence of what a reasonably prudent physician would do under like or similar circumstances, it is not conclusive in determining the applicable standard required. *Ault, supra.*

Under Civ.R. 56, summary judgment must be denied unless the evidence submitted demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Whiteleather v. Yosowitz* (1983), 10 Ohio App.3d 272, 10 OBR 386, 461 N.E.2d 1331. This standard frequently precludes summary judgment in malpractice actions where the trier of fact must evaluate the conduct of the physician—even when the conduct is undisputed. *Id.* Indeed, even the issue of proximate cause is seldom resolvable by summary judgment. *Id.*

▮ In this appeal, plaintiffs contend that the trial court erred in granting summary judgment because they presented expert evidence that defendants deviated from accepted medical practice and that this caused or contributed to Tiffany's brain injury. By this evidence, plaintiffs seek to connect the alleged negligent administration of the last three DPT shots given by Drs. Pappas and Bachman to the alleged negligence of Tiffany's previous physicians, Drs. Rupp and Sommer. To accomplish this, plaintiffs argue that, in light of the fact the DPT inoculation is mandated or prescribed by state law— and therefore will be administered at some time in a child's early development—the defendants had a duty under informed consent law or fiduciary law to inform plaintiffs that DPT was a possible cause of Tiffany's seizures, thus guarding against the risk of improper inoculation. Plaintiffs likewise assert

that defendants had a duty to indicate in their medical records that the pertussis component of the DPT shot should not be given or should be delayed. In essence, they maintain that the defendants should have "flagged" a possible allergic or adverse drug reaction in Tiffany's medical records so future medical providers would be aware of the problem and take precautions against improper inoculation.

The testimony supporting plaintiffs' theory, construed most strongly in their favor under Civ.R. 56, is as follows. Both of plaintiffs' experts testified that the shots given by Dr. Pappas should not have been given and that these shots caused Tiffany's brain damage.[2] Defendants' experts wholly disagreed. Consequently, issues of fact exist concerning this aspect of the case.[3] However, the evidence material to plaintiffs' theory in this appeal is as follows.

Plaintiffs' expert witness, Dr. Mark E. Thoman, a pediatrician and DPT researcher, testified via deposition that all of the defendants were negligent in this case. However, the sole basis of his criticism of the care provided by defendants Drs. Rupp and Sommer relates to events after the first inoculation and hospital admission. Specifically, his testimony regarding a duty to communicate a possible drug reaction or contraindication is as follows:

" * * * I have a problem with the fact that once this DPT even then though it was five days before the seizure occurred the lack of appropriately alerting

2. Dr. Mark Thoman indicated that it is most probable that the DPT caused the problems from which Tiffany now suffers. Dr. Abramson also indicated that in his opinion the pertussis component of the vaccine caused the encephalopathy.

3. We also note that there is a substantial dispute among the medical experts in this case as to whether DPT can ever cause brain damage. Defendants' experts, Dr. James D. Cherry, a DPT researcher at UCLA and Dr. Arnold Friedman, a professor of pediatrics at Case Western Reserve University, indicated that there is absolutely no modern scientific evidence that DPT causes brain damage. They opined that Tiffany's seizures were of unknown origin, consistent with infantile myoclonic epilepsy. Defendants' expert Dr. George W. Paulson, a neurologist at Ohio State University Hospital, who at one time practiced with Dr. Bachman, indicated however that a DPT reaction as alleged is possible but only one child in millions would have such a reaction. By contrast, plaintiffs' experts Dr. Mark E. Thoman and Dr. David C. Abramson testified in deposition that DPT can cause brain damage, and that physicians knew this in 1978. According to the expert testimony, there appears to be a split among the profession concerning scientific causation. At any rate, Dr. Thoman characterizes DPT as an endotoxin which, when given to an infant with a seizure disorder, is like injecting poison. Indeed, the manufacturer's drug package insert for the vaccine indicated in 1978 that DPT was contraindicated in children with evolving seizure disorders. In fact, this was the position taken by the American Academy of Pediatrics in its "Redbook." Further, it appears that Mrs. Turner first made the connection between her daughter's brain damage and the shot when Dr. Edward Kosnick, a neurosurgeon who practiced with Dr. Bachman, wrote a letter to Mrs. Turner at her request in which the doctor stated that in all probability the brain damage was causally related to the shot.

subsequent physicians and caretakers to the readministration of pertussis vaccine since it was tremendously neurotoxic."

Accordingly, he said that the pediatrician in charge, Dr. Sommer, should have advised against subsequent administration of the drug along with the consulting neurologist, Dr. Bachman. Further, he said that Dr. Rupp should have warned in similar fashion in his charts as well. His sole criticism of the hospital, pursuant to plaintiffs' *respondeat superior* theory, relates to the fact that Dr. Sommer was an employee of the hospital.

Dr. Thoman explained more particularly that some notation should have been made on the discharge summary prepared by Dr. Sommer to alert or warn others that future DPT shots should be avoided. Likewise, Dr. Thoman said that Dr. Bachman should have told Dr. Pappas that further DPT shots should not be given.

Although annotation of the medical records is an acceptable mode of communication, Dr. Thoman indicated that a letter or phone call to the primary care physician could suffice. In any event, it was important to get this information primarily to the physician and secondarily to the patient.

Dr. Thoman said that defendants did not have to communicate all the conditions that had been excluded by initial diagnosis; rather, they had to indicate that no cause was found and that DPT was a possibility that contraindicated further administration of the vaccine.

Dr. Thoman admitted that the prescribing physician bears the ultimate responsibility for giving the shot, but he said that the prescribing physician needs information from prior caregivers in order to make an informed and judicious decision. He concluded that if the neurologist, Dr. Bachman, would have advised against administration, then Dr. Pappas, as primary care physician, would not have given the inoculation.

Dr. David C. Abramson, a board-certified pediatrician specializing in family practice, likewise faulted defendants for failing to warn of an allergic reaction to DPT contraindicating further administration of the drug. As to Dr. Rupp, he stated:

"When this child was discharged from the hospital Dr. Rupp should have noted on the child's chart that this child was not to get DPT No. 2 and is to get DT, and when his record got transferred over to Dr. Pappas they should have reflected that. That's the only opinion I have about Dr. Rupp."

He said Dr. Rupp should have recorded this information on both the front of the patient's chart and wherever it is that he " * * * flag[s] patients' charts with allergies and potential problems, adverse drug reactions or whatever."

When asked why a physician should chart a drug reaction contraindication, Dr. Abramson said:

"So that there can be no mistakes, so that he can't forget. He sees many patients, his nurse sees many patients, so that we flag charts from the patients who are allergic to medications, shouldn't get certain medications, especially those that are routinely given. We put big flags on the chart in one place or another or sometimes many places."

He nevertheless indicated that: "Dr. Pappas independently and independent of what Dr. Rupp's office records indicated should have come to the conclusion that this child could not receive the pertussis vaccine as well." Like Dr. Thoman, he recognized that Dr. Pappas was the one to make the decision that this child was not a candidate for pertussis. He said that Dr. Pappas had all the history he needed to do this. Dr. Abramson simply stated: " * * * My opinion is clear that Dr. Pappas should have made the decision on his own without Dr. Rupp's chart telling him so. The child doesn't get pertussis."

Consequently, he stated that even if Dr. Rupp failed to make the required notation, and if Dr. Pappas had exercised the proper care, he would not have given the second shot. Nevertheless, Dr. Abramson said that if Dr. Rupp had annotated the chart, it would have made a "huge difference" in Dr. Pappas's behavior because " * * * you behave differently when a colleague has said such and such a behavior shouldn't be done. It just puts you in an entirely different ball game."

He also recognized that Dr. Bachman had no staff privileges at Children's Hospital and could not use the charts there, which should have similarly been marked, but he said that a consultant should make a notation on his own charts. Nevertheless, he viewed Dr. Bachman's role as that of seizure control and consultation with respect to medication for seizures. He thought Dr. Bachman had elected not to get involved with the DPT issue and Dr. Abramson could not say that this was substandard because this was his election. Hence, he said in the final analysis Dr. Bachman had no duty to annotate his chart.

With respect to Dr. Sommer, he said she met the standard of care except that the hospital discharge instruction should have been "flagged" to indicate that no further pertussis should be given. He opined that the during the hospitalization, the physicians were not required to say that seizures were probably due to the pertussis reaction. Rather, he said that it was only necessary that they note that DPT was contraindicated due to the evolving nature of the seizures. However, he said that if no further care was contemplated, and the child was to be followed by a pediatrician, he had no

criticism. That is, if the defendants did not contemplate care for the administration of the DPT, they had no duty to make any annotation on their charts.

Dr. Highley was an intern serving his residency at the time of Tiffany's hospitalization who worked in the hospital's pediatric clinic. He stated that if there was a belief or concern that pertussis vaccine could cause further harm to the child then it would have been within the accepted standard of care in 1978 for one of the treating physicians at Children's Hospital to discuss that concern with the family. He had no recollection of having done so and could not say whether Dr. Sommer had done so.

Dr. Sommer, the attending physician on Tiffany's case at Children's Hospital, could not recall whether DPT had been discussed with the parents. Indeed, she said that to the best of her recollection an association with Tiffany's condition and DPT had not been made. She said the discharge summary for Tiffany did not indicate that Tiffany's seizures were evolving because she was not qualified to make such a determination. Rather, that was within Dr. Bachman's area of expertise. Although she was skilled in pediatrics, she said she had never administered or ordered a DPT inoculation. She would have deferred to Dr. Bachman in this regard.

Dr. Bachman testified that his role as a consultant was to make recommendations regarding the child's seizure disorder in terms of treatment and to try to diagnose the cause of the seizures. In his opinion, DPT was never contraindicated because Tiffany's symptoms occurred too far after the shot. He thought that symptoms of a reaction had to occur within the first few days after the shot. He admitted that he had not even reviewed all the literature on the subject. He also said that it was not the practice of previous caregivers to warn attending physicians of their opinions concerning drug contraindications. But if a primary caregiver had given him such information it would not have made a difference because it was not his responsibility at all to decide whether a child should get a DPT shot. He did say that if Dr. Rupp called him indicating that DPT was contraindicated and if he believed DPT could cause brain damage then it would be reasonable to assume that he would have discussed it with the parents of the child.

Dr. Pappas testified that he did not feel that DPT was contraindicated in Tiffany's case in 1979. He said that if Dr. Rupp had indicated to him that he was concerned that DPT was a problem, he would have considered this information, gotten Dr. Bachman's input, researched the issue, and then brought it to the parent's attention so that they could assess the risks and benefits of further administration of the drug. He said he had communicated with Dr. Bachman only by letter. He said if Dr. Bachman had advised him that DPT was contraindicated in Tiffany's case, he would not have given it.

Conversely, if Dr. Bachman would have advised that it was not contraindicated, then he would have given it. In either case, he would have communicated with the parents because ultimately it was their decision. Likewise, Dr. Pappas said that if he had read in the hospital charts that DPT was contraindicated then he would have consulted with Dr. Bachman and then discussed it with the parents.

Dr. Arnold Friedman, a professor of pediatrics at Case Western Reserve University, said that if a particular course of action would be detrimental to Tiffany then it would be the responsibility of Dr. Sommer to inform the parents. With respect to adverse drug reactions, he said that if there were an allergic reaction to an antibiotic, for instance, this should be on the chart that would be sent to the treating physician and would also be told to the parents.

Plaintiffs submitted the affidavit of Todd and Sandra Turner in which they denied that Dr. Rupp ever discussed the relationship of DPT to their daughter's hospitalization. In fact, they deny ever having been advised of this. Further, they state that if they had been advised of the risks of permanent neurological damage from DPT, they would not have consented to further immunization.

Defendant Dr. Rupp submitted his own affidavit in which he opined that his conduct comported with the standard of care. Likewise, Dr. Bachman testified via deposition that the conduct of Dr. Rupp, Dr. Sommer, and Children's Hospital comported with the standard of care.

Plaintiffs maintain that the trial court erred in holding that, although plaintiffs submitted expert evidence that defendants deviated from the standard of care, this evidence was insufficient as a matter of law to charge defendants with malpractice. Plaintiffs assert that existing law on informed consent and the physician's fiduciary duty to the patient supports the imposition of a duty to warn of the possibility of a drug contraindication. Plaintiffs also argue that, even though this specific aspect of medical practice has not heretofore been addressed in case law, it was for the jury to decide, after proper instruction on existing law, whether plaintiffs' expert testimony evidenced a standard of care that created a common-law obligation to warn or disclose in this instance.

 In Ohio, the doctrine of informed consent is based on the theory that every competent human being has a right to determine what shall be done with his or her own body. *Siegel v. Mt. Sinai Hosp.* (1978), 62 Ohio App.2d 12, 21, 16 O.O.3d 54, 60, 403 N.E.2d 202, 208, quoting *Schloendorff v. Society of N.Y. Hosp.* (1914), 211 N.Y. 125, 105 N.E. 92. Thus, undertaking a medical procedure without informed consent can constitute either a common-law

battery or medical negligence. *Siegel, supra,* 62 Ohio App.2d at 21, 16 O.O.3d at 60, 403 N.E. at 208.

The law of informed consent has never required that the physician fully inform the patient of all potential risks. *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 17 O.O.3d 98, 407 N.E.2d 490. Rather, the proper standard of disclosure is reflected in *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 17 OBR 281, 477 N.E.2d 1145, where the Supreme Court of Ohio formulated the following syllabus law:

"The tort of lack of informed consent is established when:

"(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the *proposed* therapy, if any;

"(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and

"(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy." (Emphasis added.)

Here, plaintiffs argue that defendants had an obligation to inform plaintiffs of the risks of further pertussis inoculation because the treatment was proposed or prescribed by law. We disagree.

The law of informed consent is predicated on notions of patient sovereignty and serves to safeguard the patient's right of choice. This doctrine has not emerged to educate the patient generally on medical matters. On the contrary, it has emerged as a reflection of the fact that in modern society, medical and scientific information is more widely available and makes patients more capable of individual decisionmaking. In light of the underpinnings of the doctrine, we think that this duty to inform arises only when the physician in fact proposes some mode of treatment giving rise to a patient decision, and not before. Here, it is undisputed that none of the defendants in this appeal proposed to inoculate Tiffany with DPT. Moreover, it is also obvious and undisputed that DPT inoculations are not mandatory in Ohio but, instead, are discretionary. Hence, immunization was not automatic or prescribed by law, as plaintiffs maintain. Rather, plaintiffs' choice to inoculate arose when the prescribing physician, Dr. Pappas, proceeded to immunize. At that time, it became his obligation to inform the parents of the risks and benefits. Consequently, plaintiffs' arguments concerning lack of informed consent are not well taken.

Independent of the doctrine of informed consent, many courts have found physicians liable in malpractice for failure to communicate important information to patients. See Annotation, Malpractice: Failure of Physician to Notify Patient of Unfavorable Diagnosis or Test (1973), 49 A.L.R.3d 501. Assuredly, the physician-patient relationship is one of special trust and confidence in which the physician has a duty to reveal to the patient that which in his best interest he should know. *Phillips v. Good Samaritan Hosp.* (1979), 65 Ohio App.2d 112, 19 O.O.3d 66, 416 N.E.2d 646; *Estate of Leach v. Shapiro* (1984), 13 Ohio App.3d 393, 13 OBR 477, 469 N.E.2d 1047. Similarly, it is clear that a physician, upon completion of his services, must give the patient proper instructions to guard against the risk of future harm. *Faulkner v. Pezeshki* (1975), 44 Ohio App.2d 186, 73 O.O.2d 201, 337 N.E.2d 158. See, also, *Niemiera v. Schneider* (1989), 114 N.J. 550, 555 A.2d 1112 (evidence that physician's failure to instruct mother on DPT reactions and that earlier diagnosis might have prevented brain damage, created issue for jury).

The case law definitely bears out that patients must be told that which a reasonably prudent physician would disclose. If a doctor knows of a patient's weakened condition, susceptibility to injury, or makes a diagnosis of a disease, and then fails to tell the patient, who later suffers injury or damage because of the lack of such information, then the law holds the physician accountable.

Here, despite the expert testimony submitted, the trial court found as a matter of law that defendants had "no duty" to warn or disclose any drug contraindication. Clearly, Dr. Thoman said that such information should be communicated primarily to the treating physician and secondarily to the patient. Likewise, Dr. Abramson indicated a standard of disclosure. In fact, defendants' own witnesses testified that, if there was a concern about DPT contraindication, this should have been disclosed. Only Dr. Bachman, who disclaimed all responsibility for the DPT issue, testified to the contrary.

The trial court relied on decisions from other states which have held that a physician has "no duty" to instruct a nurse on that which she should know. *Burke v. Pearson* (1972), 259 S.C. 288, 191 S.E.2d 721 (how to apply a heating pad); *Su v. Perkins* (1974), 133 Ga.App. 474, 211 S.E.2d 421 (how to give a shot). But in those cases there was no expert testimony establishing an accepted practice among physicians to inform or instruct nurses of the proper performance of duties so as to guard against improper procedures. In those cases, the courts simply applied the general common-law rule that ordinarily one need not anticipate another person's negligence, in the absence of notice to the contrary. Cf. *Thompson v. Presbyterian Hosp.* (Okla.1982), 652 P.2d

260 (no evidence surgeon administering pre-operative drug could or should foresee negligence of anesthesiologist).

Simply put, the trial court's "no duty" rationale is unsupported by the record and applicable principles of medical malpractice and summary judgment law. It is undisputed that it was Dr. Pappas's sole *decision* to give the inoculation and seek out information. Of course, Dr. Pappas cannot claim that defendants had a duty to educate him.[4] But, the question in this case is defendants' duty towards Tiffany. Defendants entered into a physician-patient relationship with plaintiffs. Once obligated, they had to fulfill their professional obligation by conforming their conduct to the applicable standard of care and they could not disregard or abandon the patient merely because Tiffany was going to be treated by another physician. See *Bruni, supra,* 46 Ohio St.2d at 135, 75 O.O.2d at 188–189, 346 N.E.2d at 679–680. Mrs. Turner decided to change physicians, but this could not mean that there was no duty to perform any service while Tiffany was still under defendants' care. After the physician-patient relationship ends by termination, the law nevertheless requires the physician to perform whatever services are accepted in the medical profession to safeguard the patient's health. Here, the experts indicated that this included disclosure of DPT contraindication. The trial court cannot make credibility determinations under Civ.R. 56. Manifestly, under the reasonable-minds test, the weight of conflicting expert evidence and the credibility of the experts are matters peculiarly for the jury as trier of fact. *Hubach v. Cole* (1938), 133 Ohio St. 137, 143, 10 O.O. 187, 189, 12 N.E.2d 283, 286 (directed verdict).

We are also troubled by the trial court's "no duty" reasoning, which implies a judicially imposed standard of care (or more accurately, a standard of no care). Compare *Helling v. Carey* (1974), 83 Wash.2d 514, 519 P.2d 981 (custom of the opthamological profession of not giving glaucoma tests to patients under forty was not good medical practice as a matter of law) and *Melnyk v. Cleveland Clinic* (1972), 32 Ohio St.2d 198, 200, 61 O.O.2d 430, 431, 290 N.E.2d 916, 917 (" * * * to carelessly leave a large and obvious metallic forceps and a nonabsorbent sponge in a surgical patient's body is negligence as a matter of law * * * ") with *Truman v. Thomas* (1980), 27 Cal.3d 285, 165 Cal.Rptr. 308, 611 P.2d 902 (jury should have determined whether doctor must advise the patient concerning the danger of failing to have a pap smear),

---

4. The law does limit one's duty to act for another's benefit, as it likewise limits responsibility for sheer economic damage or mental disturbance. See Prosser & Keeton, The Law of Torts (1984) 375, Section 56. So, even a doctor has no legal duty to be a good samaritan and fly to some corner of the globe to perform an operation. But the question of duty is limited to whether there is *any* duty, not *what* that duty is. *Id.* at 356.

vacating (1979), 93 Cal.App.3d 304, 155 Cal.Rptr. 752 (no duty to warn of consequences as a matter of law).

We decline to accept the trial court's imposition of a standard of medical care; not only because there are no compelling facts here to do so, as there were in *Helling,* but also because the trial court ruled as it did in the context of summary judgment, with disputed facts, issues, and evidence to be developed and judged. In fact, there is no basis to conclude that the standard elucidated by the experts in this case is an "unreasonable burden" on the medical profession, as the court concluded. Actually, almost every expert witness in this case did not think it was unreasonable. It is a simple matter of marking a chart or talking to a patient. It is like telling a patient that he should wear a wrist bracelet indicating an allergy to penicillin so the patient will not die of anaphylactic shock.[5]

Given the evidence presented, we think that reasonable minds could come to differing conclusions about whether Dr. Rupp committed medical malpractice by failing to communicate the possibility of an adverse drug reaction. However, we do not think that the same can be said about Dr. Sommer and Children's Hospital. Though plaintiffs' experts indicated that someone at Children's Hospital should have made notations on the hospital charts concerning DPT, we cannot see any connection with Tiffany's injury. Dr. Sommer referred the neurological problem to Dr. Bachman. There is no evidence that this was a negligent referral. Dr. Bachman could not annotate the hospital charts. His failure to diagnose the problem, to be properly involved, and to communicate with the parents cannot be charged to Dr. Sommer, who was acting independently in a limited role. Cf. *Martin v. Children's Hosp.* (Apr. 29, 1980), Franklin App. No. 79AP–806, unreported (hospital resident not liable for compliance with orders of physician in charge of patient care). Further, while it is undisputed that no one at the hospital communicated to the parents about DPT, Dr. Abramson specifically testified that if further care was not contemplated by the hospital, because the patient was under the care of another physician, then the duty to communicate ceased. Consequently, the trial court's grant of summary judgment to Dr. Sommer and Children's Hospital was correct and is affirmed.

---

**5.** It is not difficult to understand why reasonably prudent physicians document or communicate adverse drug reaction information to and for the benefit of their patients. Patient symptoms can be buried within mounds of medical records that require scrupulous and careful medical analysis. Pre-prescription tests may be unavailable, ineffective, or costly. If the prescribing physician asks you if you are allergic to certain medication and you say no because it was never told to you, and if the reaction was never documented, the adverse consequences may be severe.

The court's conclusion that Dr. Pappas's negligence was an intervening cause relieving all previous physicians of liability as a matter of law is likewise unsupported under existing law. Mere intervening causes do not break the chain of causation. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 21 O.O.3d 177, 423 N.E.2d 467. Only *superseding* intervening causes break the chain of causation. If an intervening cause or event, including the subsequent or successive negligence of another tortfeasor, is that which might happen in the natural and ordinary course of things anticipated as reasonably probable, that is, if the intervening cause or event is *foreseeable,* or necessitated by the original negligence, then the intervening cause or event is not superseding in the law and will not relieve the offender of liability. *Taylor v. Webster* (1967), 12 Ohio St.2d 53, 56, 41 O.O.2d 274, 275–276, 231 N.E.2d 870, 872–873; *Cascone v. Herb Kay Co.* (1983), 6 Ohio St.3d 155, 6 OBR 209, 451 N.E.2d 815.

In the present case, the expert testimony submitted by plaintiffs supports the conclusion that documenting a drug contraindication or disclosing this to the plaintiffs was required to guard against the risk of mistakes in inoculation. It can reasonably be concluded from this evidence that the failure of Dr. Rupp to perform the required standard of care gave rise to a risk of improper inoculation. That the damage occurred at the hands of another *negligent* doctor does not change the fact that the result is the same one which the breach of duty would ordinarily give rise to and operate to bring about. A reasonable mind could conclude that the improper inoculations and resulting injury were foreseeable in this case.

There may be some intuitive appeal to limiting liability to the last person in line that causes damages. But the last clear chance rule applies only to the doctrine of contributory negligence. We do not think that this is altered in any way by the learned intermediary rule of products liability law or any other sound principle of law.

Accordingly, plaintiffs' assignment of error is sustained in part and overruled in part. The judgment of the trial court is reversed. The cause is remanded for further proceedings consistent with this opinion and in accordance with law.

*Judgment affirmed in part,*
*reversed in part,*
*and cause remanded.*

STRAUSBAUGH and JOHN C. YOUNG, JJ., concur.