**GARVIN, Exr.,**

v.

**UNIVERSITY OF CINCINNATI HOSPITAL.**

Court of Claims of Ohio.

No. 99–07282.

Decided Nov. 3, 2000.

*William Flax,* for plaintiff.

*Betty D. Montgomery,* Attorney General, *Anthony J. Celebrezze, Jr.* and *Marilena R. Walters,* Special Counsel to the Attorney General, for defendant.

EVERETT BURTON, Judge.

Plaintiff's complaint alleges medical negligence and wrongful death provided by defendant's employee, Dr. Duane Sigmund, to plaintiff's decedent, Dr. Peter Garvin,[1] arising out of treatment for non-Hodgkins lymphoma. Plaintiff contends that chemotherapy treatment was negligently administered and that its toxic

---

1. For purposes of this decision, "plaintiff" refers to Madeline M. Garvin, executor, and "Garvin" refers to plaintiff's decedent, Dr. Peter Garvin.

effect caused Garvin to develop a heart disease that resulted in his death. Defendant denies liability.

In October 1995, Garvin was diagnosed with stage IV large cell non-Hodgkins lymphoma, the most advanced stage of the disease. He was subsequently referred to Dr. Sigmund for treatment. Garvin was informed that, due to his medical history, chemotherapy was the only effective treatment option and that, without treatment, death would occur within "weeks to months." The standard treatment for Garvin's disease was "CHOP" therapy, a combination of chemotherapy drugs that includes Adriamycin.

Garvin was advised of the risks of each of the drugs used in CHOP therapy. Dr. Sigmund specifically discussed the risks of Adriamycin, which can include cardiotoxicity. The risk of cardiotoxicity from Adriamycin increases as the cumulative dosage administered to a patient increases. According to the medical records, Garvin was informed on October 11, 1995, that his lymphoma was not curable without chemotherapy. At that time he acknowledged the inherent risks and was prepared to begin the treatment the following day.

Dr. Sigmund monitored Garvin's heart function by both physical examination and through the use of a "MUGA" scan. An initial baseline MUGA scan was administered after Garvin was given the first of six cycles of CHOP therapy. After six cycles of CHOP therapy, Dr. Sigmund determined that Garvin was not in complete remission and that he required additional cycles. According to Dr. Sigmund, a second MUGA scan would be administered after Garvin had received a cumulative dose of Adriamycin of 400 milligrams per meter squared. Dr. Sigmund did not order a repeat MUGA scan prior to Garvin's seventh round of chemotherapy because the cumulative dose of Adriamycin at that point was only 300 milligrams per meter squared. The seventh cycle of CHOP was administered on February 15, 1996.

On March 5, 1996, Garvin visited his primary care physician, Dr. Kulkarni, complaining of shortness of breath. He was admitted to The Jewish Hospital and subsequently discharged with a diagnosis of congestive heart failure on March 25, 1996. After his discharge, Garvin remained under the care of a cardiologist, who prescribed medications for the heart condition. On October 17, 1998, Garvin was again admitted to The Jewish Hospital with diarrhea and vomiting. Hospital records show that Garvin was also diagnosed with renal failure at the time of his admission. On October 21, 1998, Garvin experienced respiratory failure as a result of acute bacterial pneumonia. Shortly thereafter, he was pronounced dead after persistent cardiac arrhythmia. The autopsy report establishes that there was no evidence of lymphoma or metastatic carcinoma at the time of his death.

In order to prevail on a claim of medical malpractice or professional negligence, plaintiff must first prove (1) the standard of care recognized by the medical community, (2) the failure of defendant to meet the requisite standard of care, and (3) a direct causal connection between the medically negligent act and the injury sustained. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673. The appropriate standard of care must be proven by expert testimony. *Id.* at 130, 75 O.O.2d at 186, 346 N.E.2d at 676. That expert testimony must explain what a medical professional of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances. *Id.* at 131, 75 O.O.2d at 186–187, 346 N.E.2d at 677.

With regard to the claim that Dr. Sigmund deviated from the standard of care in monitoring Garvin's heart function during chemotherapy, the court is persuaded by the testimony of plaintiff's expert, Donald Wayne, M.D. Dr. Wayne was Garvin's treating cardiologist at The Jewish Hospital from October 1996 until October 1998. In his deposition, Dr. Wayne stated that the accepted standard of care requires a MUGA scan at the initiation of CHOP therapy and a repeat scan when the accumulated dosage of Adriamycin reaches 350 to 400 milligrams per meter squared. Dr. Wayne specifically stated that the standard of care does not require serial use of MUGA scans to monitor a patient's heart after each cycle of CHOP.

In contrast to Dr. Wayne's opinion, John Pancoast, M.D., an oncologist, testified that the standard of care *should* have included a MUGA scan before each cycle of chemotherapy. However, Dr. Pancoast also explained that he was uncertain of the meaning of the term "standard of care" and that it was not the common practice of oncologists to order a MUGA scan prior to each treatment.

Defendant offered the expert testimony of Kenneth McCarty, M.D., a professor of medicine and pathology. Dr. McCarty testified that he has administered Adriamycin on many occasions and that its toxic effects increase significantly after the cumulative dosage exceeds 400 milligrams per meter squared. Dr. McCarty agreed with Dr. Wayne's opinion that the standard of care requires a baseline MUGA scan at the beginning of CHOP therapy and a repeat scan when the patient receives a cumulative dosage of 400 milligrams per meter squared.

Based upon the expert testimony, the court finds that Dr. Sigmund did not deviate from the accepted practice of monitoring the cardiac function of a patient receiving Adriamycin. While the customary practice is not conclusive in determining the applicable standard required in a medical malpractice claim, it is evidence of what a reasonably prudent medical provider would do under like or similar circumstances. *Ault v. Hall* (1928), 119 Ohio St. 422, 164 N.E. 518, paragraph three of the syllabus; see, also, *Turner v. Children's Hosp., Inc.* (1991), 76 Ohio App.3d 541, 548, 602 N.E.2d 423, 427. The court concludes that

Dr. Sigmund met the standard of care for monitoring Garvin's heart function and that the procedures used by Dr. Sigmund were reasonable.

■ Plaintiff also alleges that the seventh cycle of CHOP therapy administered to Garvin was unnecessary and that he suffered toxic side effects as a consequence of the final treatment. Plaintiff relies on the testimony of Dr. Pancoast to support her argument that Garvin was in complete remission prior to the seventh cycle of chemotherapy. Dr. Pancoast testified that, based upon his review of a February 1996 CAT scan, he was ninety-five percent certain that Garvin was in complete remission prior to the final cycle of CHOP therapy. However, since Dr. Pancoast did not treat Garvin prior to May 1996 and did not perform a complete review of the medical records in this case, the court finds that his testimony concerning Garvin's condition in February 1996 lacks credibility. Furthermore, given the undisputed evidence that the failure to obtain complete remission of Garvin's lymphoma would quickly result in his death, the court finds that even a five percent chance of the existence of lymphoma would justify the decision to continue CHOP therapy.

■ Although plaintiff maintains that Garvin's death was the result of Adriamycin-induced cardiomyopathy, the evidence presented at trial does not support plaintiff's claim. The expert evidence established that the three types of cardiomyopathy are dilated, hypertrophic, and restrictive. Adriamycin cardiotoxicity is associated with characteristic pathological changes in the heart that can be definitively diagnosed with an endomyocardial biopsy. Specifically, Adriamycin toxicity results in dilated cardiomyopathy.

Plaintiff's expert did not make a pathologic diagnosis of dilated cardiomyopathy secondary to Adriamycin cardiotoxicity. Rather, it was conceded that a differential diagnosis of Adriamycin cardiotoxicity cannot be made based solely upon a clinical presentation. Defendant's expert, Dr. McCarty, reviewed Garvin's medical records and autopsy slides. Dr. McCarty concluded that Garvin had hypertrophic cardiomyopathy and that there was no evidence of Adriamycin cardiotoxicity. Consequently, the court finds that Garvin did not experience Adriamycin-induced dilated cardiomyopathy. Therefore, this claim is without merit.

With regard to plaintiff's claim that defendant negligently failed to obtain informed consent prior to administering chemotherapy, the court finds that Dr. Sigmund disclosed the risks of CHOP therapy to Garvin and obtained prior consent.

For all the foregoing reasons, judgment is rendered in favor of defendant.

*Judgment for defendant.*

EVERETT BURTON, J., retired, of the Scioto County Court of Common Pleas, sitting by assignment.