OPINION
This is an appeal by plaintiff, Cleola Hughes, from a judgment of the Ohio Court of Claims, rendered in favor of defendant, University of Cincinnati Hospital, on plaintiff's medical malpractice claim.
Plaintiff is the administratrix of the estate of Jacquelyn Myrick. On May 27, 1994, plaintiff's decedent, Myrick, was admitted to the University of Cincinnati Hospital. On June 21, 1994, Myrick sustained an anoxic brain injury; she died on November 1, 1994. On February 2, 1998, plaintiff filed a complaint in the Court of Claims against defendant, alleging that employees of defendant deviated from acceptable standards of care and acted in a negligent manner in their care and treatment of Myrick, including negligently intubating her.
Beginning on May 10, 1999, the matter was tried before the court on the sole issue of liability. The facts indicate that Myrick was diagnosed with a malignant thymoma (cancer of the thymus gland) in April 1992. She was thirty-six years of age at the time. Myrick received chemotherapy and radiation treatment for the cancer. Complications from the radiation treatment resulted in a serious scarring condition (bronchiectesis), requiring doctors to remove Myrick's entire left lung.
Myrick resided in Florida following the surgery, and during that time she began suffering from recurrent pleural effusions, an accumulation of fluid on the outside of her right lung. The fluid on Myrick's lung compressed her breathing to the point that, on various occasions, she had to be "intubated" and placed on a mechanical ventilator until the fluid could be removed.
Endotracheal intubation is a procedure in which an artificial airway is established by inserting a tube into the patient's trachea. The physician passes the tube through the patient's mouth (or less frequently through the nose) into the back of the throat area, beyond the laryngeal structures and vocal cords, and into the trachea. Once the tube is placed in position, a "cuff" (a small balloon on the distal end of the tube) is inflated to secure the airway and to keep the tube from being displaced.
Because of her progressive respiratory failure, Myrick returned to Cincinnati to consult with physicians regarding her condition. Myrick was hospitalized in April 1994 at the University of Cincinnati Hospital because of increased shortness of breath. She was transported to the emergency room and intubated. Fluid was drawn off of her chest, and she was "extubated" within a day or two and then discharged.
Due to a continuing buildup of fluid, doctors attempted to treat Myrick by a procedure termed "chemical pleurodesis," in which a sclerosing agent is introduced into the area of the outside lungs and ribs. The purpose of the procedure is to cause a union between the two layers of pleura to prevent the re-accumulation of fluid in the pleural space. This procedure proved to be unsuccessful.
In May 1994, a "decortication" procedure was performed, in which the pleural lining of Myrick's lung was removed. Following this procedure, Myrick received oxygen from a ventilator for several days. On June 18, 1994, Myrick was transferred to the hospital's medical step-down unit. At the time she was transferred, Myrick was still experiencing breathing problems, and she received oxygen through a BiPAP (bilevel positive airway pressure) device.
On June 21, 1994, at approximately 11:00 a.m., Myrick's pulse-rate was recorded at one hundred thirty. By 2:00 p.m., her respiratory rate rose to forty. At 3:00 p.m., it was reported that Myrick was complaining of shortness of breath, and her oxygen saturation rate was between ninety-three and ninety-five percent.
At 4:00 p.m., Myrick's oxygen saturation rate fell to eighty-three percent, and she appeared apprehensive. The acting intern, Dr. Padma Subramanian, evaluated Myrick and then summoned Dr. Mukund Kumar Patel. At 4:05 p.m., a blood gas was drawn, indicating that the patient's carbon dioxide level had reached an extremely high level, in excess of one hundred, a sign of acute respiratory failure.
Dr. Patel then made a decision to intubate the patient. Dr. Subramanian initially attempted to visualize the patient's vocal cords with a laryngoscope, but was unsuccessful. Following this first attempt, Myrick received bag and mask-assisted ventilation. Dr. Subramanian made a second attempt to visualize Myrick's vocal cords but was again unsuccessful. Myrick again received ventilation by means of the bag and mask. Dr. Douglas Shellhorn arrived at the unit during this time, and he ordered the administration of the drugs morphine and Ativan to relax the patient.
Dr. Patel then attempted to perform the intubation. His first attempt was unsuccessful, and Myrick was again provided oxygen assistance. On his second attempt, Dr. Patel visualized the vocal cords and passed the endotracheal tube. In his deposition testimony, Dr. Patel stated that someone in the medical step-down unit then listened for breath sounds in the patient's lung and stomach area, and that breath sounds were heard over the patient's chest (indicating that the tube was in the trachea); further, there was no indication of abdominal distention. Dr. Shellhorn testified that Myrick's vital signs were monitored, including her blood pressure and pulse.
Following the placement of the tube, Dr. Patel and Dr. Shellhorn made a determination that the patient's condition had stabilized enough to allow her to be transported from the step-down unit to the intensive care unit. The intensive care unit is approximately thirty to fifty yards distance from the medical step-down unit. At the time she was transported, Myrick was ventilated by means of "Ambu-bagging," whereby air is forced into the lungs through the endotracheal tube. Myrick arrived at the intensive care unit at 4:15 p.m.
Dr. Peter Dain took over care of Myrick in the intensive care unit. Dr. Dain testified that, when Myrick arrived at intensive care, she was in "stable condition, she did have a blood pressure and a pulse." (Tr. 808.) Medical records noted her condition as general cyanosis, cool, clammy. Myrick's heart rate then became slower, and Dr. Dain made a decision to remove the endotracheal tube and reintubate the patient. Dr. Dain testified that he extubated the patient and she was bag-masked. Dr. Dain further testified that, as he was preparing another tube for reintubation, the patient went into cardiopulmonary arrest. Doctors in the intensive care unit performed cardiopulmonary resuscitation on Myrick, and she received three medications in an attempt to resuscitate her heart rhythm. Myrick's rhythm was eventually restored, and Dr. Dain reintubated her at 4:26 p.m. Although Myrick stabilized, by 4:30 p.m., she had suffered anoxic brain injury and was in a coma.
Myrick remained in a coma following the events of June 21. In October 1994, doctors found pulmonary infiltrates in Myrick's right lung, but they were unable to determine the cause of the infiltrates. On November 1, 1994, Myrick died. On the death certificate, the cause of death was listed as respiratory failure from pulmonary congestion.
At trial, both sides presented extensive evidence in the form of medical records, trial testimony and the introduction of deposition testimony. Plaintiff presented two expert witnesses, Dr. John Stauffer, a member of the medical staff at Penn State University College of Medicine, and Dr. Cory Franklin, the director of the medical intensive care unit at the Cook County Hospital in Chicago, Illinois.
In general, plaintiff's theory of the case was that Dr. Patel performed an esophageal intubation, in which the endotracheal tube was placed in the patient's esophagus rather than the trachea. Plaintiff did not assert that it was below the standard of care for a physician to place an endotracheal tube in a patient's esophagus; rather, Dr. Stauffer noted that esophageal intubations are common, particularly during difficult or complicated intubation procedures. Plaintiff contended, however, that malpractice occurred because physicians failed to recognize that the endotracheal tube was not properly placed before the decision was made to transport the patient from the medical step-down unit to the intensive care unit. According to Dr. Stauffer, if the endotracheal tube is in the proper position, there should be "some clinical evidence of improvement in the patient's status." (Tr. 171.) Dr. Stauffer opined that it was not within the standard of care to take the time to transfer the patient from the step-down unit to the intensive care unit; he stated that the physicians failed to establish various physical findings before the decision to transfer was made.
Plaintiff's other expert, Dr. Franklin, opined that "the most likely explanation" for Myrick's cardiac arrest was that Dr. Patel inserted the endotracheal tube into her esophagus. He stated that the fact Myrick's heart rate and blood pressure returned after Dr. Dain performed the reintubation was consistent with the theory that Dr. Patel performed an esophageal intubation. Dr. Franklin opined that Dr. Patel deviated from the standard of care in failing to see any improvement in the patient, and that the deviation in standard of care resulted in the patient suffering anoxic brain damage.
The defendant's theory was that Myrick's anoxic condition and cardiac arrest resulted from her underlying pulmonary disease and cardiac disease. Dr. James Allen, an associate professor of internal medicine at the Ohio State University Medical Center, and the director of the medical intensive care unit and the diagnostic labs at the hospital, testified as an expert witness on behalf of the defendant. Dr. Allen testified that, in many instances of respiratory failure, a patient might not show improvement despite the placement of the endotracheal tube. He stated that, "[s]imply getting air into the trachea is only the first step in correcting respiratory failure." (Tr. 1021.) Dr. Allen testified that the deposition testimony he reviewed provided evidence of an endotracheal intubation, and that evidence of an esophageal intubation was lacking. Dr. Allen opined that doctors in the medical step-down unit acted within the standard of care at the time Myrick was transferred. His opinion was based on evidence that the doctor performing the intubation visualized the patient's vocal cords, that adequate breath sounds were heard over the patient's chest, and that the patient was stabilized prior to being transferred.
Dr. Allen further opined that the most likely explanation for the patient's deteriorating condition on June 21, 1994 was a mucous plug that obstructed her airway. Dr. Allen cited the following factors in support of his opinion: Myrick had pneumonia, "which can produce mucous and produce sputum"; the patient was found to have "staph aureus in her sputum after her resuscitation," indicating the proper setting for development of mucous plugs (Tr. 1050.); x-rays of Myrick taken immediately after her cardiac arrest revealed a "new pulmonary infiltration in her right lung" (Tr. 1050.); Myrick had "chronic respiratory insufficiency," causing her to intermittently experience a very high respiratory rate as well as a high carbon dioxide level (Tr. 1050.) and; at the time Dr. Patel performed the intubation, he noticed mucus in the back of the patient's throat, requiring Dr. Patel to suction the mucus prior to placing the tube. Finally, Dr. Allen opined that the actions of the physicians in the medical step-down unit were not the proximate cause of Myrick's death.
By decision filed on September 15, 1999, the Court of Claims concluded that plaintiff failed to prove, by a preponderance of the evidence, that defendant's agents deviated from the standard of care, and the court entered judgment in favor of defendant.
On appeal, plaintiff sets forth the following two assignments of error for review:
ASSIGNMENT OF ERROR NO. 1:
 THE DECISION OF THE COURT OF CLAIMS IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, WHERE THE COURT OF CLAIMS DISREGARDED THE MEDICAL RECORDS, KEPT IN THE REGULAR COURSE OF BUSINESS AND PREPARED SIMULTANEOUSLY WITH THE EVENTS OF JUNE 21, 1994, AND INSTEAD ACCEPTED IN TOTO THE SELF-SERVING VERSION OF THE FACTS OF THE CASE SET FORTH BY THE DEFENDANT DOCTORS IN THEIR DEPOSITION AND TRIAL TESTIMONY.
ASSIGNMENT OF ERROR NO. 2:
 THE TRIAL COURT ERRED IN ADMITTING THE TESTIMONY OF DEFENDANT'S EXPERT WITNESSES OVER PLAINTIFF'S OBJECTION IN THAT NEITHER EXPERT WAS PROPERLY QUALIFIED PURSUANT TO OHIO EVIDENCE RULE 601(D).
Under the first assignment of error, plaintiff challenges the judgment of the trial court as being against the manifest weight of the evidence.
In general, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. FoleyConstr. Co. (1978), 54 Ohio St.2d 279, syllabus. Further, "[o]n the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus.
In Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, paragraph one of the syllabus, the Ohio Supreme Court held:
 In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things.
In the present case, in finding that defendant's agents did not deviate from the standard of care required of physicians, the court held in pertinent part:
 Plaintiff's expert, Dr. Stauffer, has written many articles about intubation. One such article that was presented at trial sets forth the steps to be taken to confirm proper ET tube placement. These steps include physically examining the patient by looking at the chest for symmetrical expansion, and listening for breath sounds in the chest and epigastric area. (Plaintiff's Exhibit 8.) The article also mentions that cuff palpitation is useful in confirming proper tube placement, and that an X-ray is usually necessary in most cases to confirm proper placement. Id. The court finds that, based on the evidence presented at trial, defendant's doctor's met the standard of care to confirm proper ET tube placement. Specifically, once Dr. Patel visualized the vocal cords and passed the ET tube, someone, either a nurse or a respiratory therapist, checked for breath sounds in the chest and epigastric region. Breath sounds were heard in the chest. Myrick's stomach was not distended, her blood pressure was 120 over palpable, and she had a pulse. At that time, Myrick was moved to the MICU, where she could receive the proper treatment as a critically ill patient, and where an X-ray could be take to assure proper ET tube placement. Plaintiff has not proven, by a preponderance of the evidence that defendant's agents deviated from the standard of care.
In arguing that the decision of the trial court is against the manifest weight of the evidence, plaintiff contends that testimony accepted by the trial court, indicating that various personnel in the medical step-down unit took proper steps to evaluate Myrick's stability, is "far from uncontradicted." Plaintiff argues that the medical records and the testimony of witnesses fails to support a finding that Myrick was stable at the time the decision was made to transport her to the intensive care unit.
At trial, the videotaped deposition testimony of Dr. Patel was introduced into evidence. Dr. Patel gave the following testimony regarding the actions he took during the intubation of the patient on the date at issue. After he initially arrived at the medical step-down unit, Dr. Patel noticed that Myrick was breathing rapidly and using her accessory muscles. Dr. Patel then made the decision to intubate the patient. Dr. Subramanian first attempted the intubation, but she was unable to visualize the patient's vocal cords. After the first attempt, the patient was Ambu-bagged to ensure adequate oxygenation. Dr. Subramanian made another attempt to visualize the patient's vocal cords, but was again unsuccessful.
Because the patient was becoming combative, the drugs morphine and Ativan were administered. The patient was Ambu-bagged again, and Dr. Patel then administered a nasotracheal suction device to the patient's throat, because "there was a lot of mucus." (Depos. Patel, 114.) Dr. Patel was unable to visualize the vocal cords on his first attempt at intubation. On the second attempt, Dr. Patel again employed the suction device to remove mucous. On this attempt, Dr. Patel was able to visualize the vocal cords and he passed the endotracheal tube.
Dr. Patel testified that, after passing the tube, "I told someone to listen to the right lung and also listen to the epigastrium to see if they hear breath sounds." (Depos. Patel, 119.) He "was told that the breath sounds were heard on the right lung. There was no abdominal distention or breath sounds heard in the epigastrium." (Depos. Patel, 119.)
Dr. Patel could not specifically remember who listened for the breath sounds, but he testified that he would not have secured the tube unless the breath sounds had been assessed. Dr. Patel recalled that Dr. Shellhorn was at the patient's bedside during the time the breath sounds were being assessed. A nurse told Dr. Patel that the patient's "blood pressure was okay * * * and she was tachycardiac." (Depos. Patel, 39.)
After assessing the patient, Dr. Patel and Dr. Shellhorn "agreed that she was stable enough to move to intensive care." (Depos. Patel, 121.) Dr. Patel estimated that it took approximately "two or three minutes" from the time he secured the tube until Myrick was taken to the medical intensive care unit. (Depos. Patel, 121.) Dr. Shellhorn and Dr. Patel accompanied the patient as she was transported to the intensive care unit. When they arrived at the unit, Dr. Dain, the senior resident in the medical intensive care unit, took over the care of the patient. Dr. Patel acknowledged that he did not write a progress note of the intubation procedure he performed.
Dr. Shellhorn testified at trial regarding the assistance he provided Dr. Patel in treating Myrick in the medical step-down unit. Although Dr. Shellhorn could not specifically remember who listened for epigastric sounds, he testified that, "I know it was done." (Tr. 623.) Dr. Shellhorn stated that, following the intubation by Dr. Patel, "[w]e continued to assess the patient * * * as far as vital signs or blood pressure, pulse." (Tr. 624.) He further testified that, "[o]nce we were convinced that she was stabilized, Dr. Patel and I then made a decision to transport the patient to the intensive care unit." (Tr. 624.)
Plaintiff argues that the testimony of Dr. Patel was unreliable because he acknowledged that he failed to record notes regarding his intubation procedure. Plaintiff contends that it was unreasonable for the trial court to accept Dr. Patel's self-serving testimony that he took steps to ensure Myrick's stability where the records fail to reflect such steps.
Plaintiff's argument raises issues of credibility and conflicting evidence. Here, the trier of fact assessed the credibility of Dr. Patel and obviously found his testimony to be credible despite the doctor's failure to make notes in the medical records regarding the intubation procedure. During his deposition, Dr. Patel acknowledged that he should have written such a note, but he testified that, "when I took her to the ICU, the chart was in ICU at that time [so] I couldn't write a note." (Depos. Patel, 73.) Regarding Dr. Patel's failure to make a notation of the events, we note that plaintiff's own expert, Dr. Franklin, stated that he "wouldn't necessarily say it's the standard of care" for a physician who performs an intubation to write a procedure or note regarding the patient's response following intubation. (Tr. 518.)
Further, the fact that neither Dr. Patel nor Dr. Shellhorn could recall the specific nurse or therapist who listened for breath sounds following the intubation does not render their testimony unreliable. Both witnesses unequivocally testified that an individual in the medical step-down unit listened for breath sounds. Regarding his inability to remember specific personnel, Dr. Patel noted that there are many nurses and therapists in the medical step-down unit who "come and go." (Depos. Patel, 53.) The fact finder could have reasonably concluded that the credibility of these physicians was not undermined by their failure to recall, more than one year after an event, various hospital personnel who assisted in a procedure.
We note that another physician, Dr. Padma Subramanian (Iyer), who was also present at the time of the intubation in the medical step-down unit, corroborated the testimony of Dr. Patel and Dr. Shellhorn that someone on the hospital staff listened for breath sounds. Specifically, Dr. Subramanian stated in her deposition testimony that "once * * * [Myrick] was intubated * * * there was someone there who had a stethoscope. They checked to make sure that they heard breath sounds." (Depos. Subramanian (Iyer), 20.) Dr. Subramanian recalled that one of the individuals in the medical step-down unit at the time was a nurse, but Dr. Subramanian did not know the specific names of any of the personnel who assisted. She testified that, "in the middle of all this an MICU resident came over when Dr. Patel was doing the intubating. So there were a couple of people in the room." (Depos. Subramanian (Iyer), 22.)
The trier of fact was also in the best position to weigh Dr. Shellhorn's recollection of the events in which he corroborated Dr. Patel's assessment that the patient was stable at the time the decision was made to transport her to the intensive care unit. As noted above, Dr. Shellhorn testified that, following the placement of the endotracheal tube, they continued to assess the patient as to her vital signs. On this issue, plaintiff's expert, Dr. Franklin, conceded that he would have no reason to dispute Dr. Shellhorn's clinical judgment that the patient had been stabilized at that time.
The instant case essentially presented for the trier of fact a battle of the experts. In a medical malpractice case, the plaintiff carries the burden of presenting sufficient evidence to allow the fact finder to consider the issue whether defendant's agent breached the standard of care. Bruni, supra. Generally, "the issue of whether the physician has employed the requisite care must be determined from the testimony of experts." Turner v.Children's Hosp., Inc. (1991), 76 Ohio App.3d 541, 548. While plaintiff's experts provided opinion testimony that Dr. Patel's treatment fell below the standard of care, there was also expert testimony by defendant's expert, Dr. Allen, indicating that defendant's agents in the medical step-down unit met the standard of care. Upon review of the record, we conclude that there was competent, credible evidence that, if believed, would support the trial court's judgment in favor of defendants.
One of the highly contested issues at trial was whether Dr. Patel placed the endotracheal tube in the patient's esophagus, rather than in her trachea. Although plaintiff's experts could not point to specific evidence that an esophageal intubation occurred, they reasoned that this was the most likely scenario. In this regard, plaintiff's experts surmised that, because Myrick did not show immediate improvement following Dr. Patel's intubation, the tube likely was misplaced.
However, defendant's expert, Dr. Allen, testified that "[c]linical improvement will not necessarily occur whether the tube is correctly placed or not." (Tr. 1020.) Rather, he stated that in many cases of respiratory failure, including conditions caused by pneumothorax, adult respiratory distress syndrome, pulmonary hemorrhage and mucous plugs, the patient might not improve despite the placement of the endotracheal tube. Dr. Allen opined that the most likely cause of Myrick's respiratory distress was the presence of mucous plugs. Specifically, Dr. Allen gave the following testimony on this issue:
 I believe that most likely given the course of events prior to her respiratory arrest and cardiac arrest, as well as based on the tests that were done after her resuscitation in the ICU, I think that most likely she had a mucous plug.
 And I base that assessment on, first of all, a proper setting for the development of mucous plug. She was found to have staph aureus in her sputum after her resuscitation.
 Also, in my review of her x-rays, I found that she had a new pulmonary infiltration in her right lung in the mid portion on the x-ray taken immediately after her cardiorespiratory arrest.
 I believe she had a pneumonia, which can produce mucous and produce sputum, which can then cause mucus plugs.
 Further, the record indicates that she was a patient who had chronic respiratory insufficiency. She had intermittently had a very high respiratory rate. A normal respiratory rate is less than 14, and hers was in the 40s for several days. She also had a high carbon dioxide level, indicating that she had respiratory insufficiency and possibly had respiratory muscle weakness.
 In that situation patients who acquire her rapid respiratory rate, and even with a rapid respiratory rate can't bring their carbon dioxide level down to normal, they typically have respiratory muscle weakness and are thus less able to clear their secretions.
 And so she had a condition which became manifest that evening after her respiratory cardiac arrest. And that is conducive to the amount of mucous she had. She was respiratory impaired and unable to adequately clear her mucous.
 And third, when Dr. Patel performed his intubation, he noticed mucous within the back of the throat and had to suction it at the time of intubation. Again, an indirect sign that there is mucous production.
* * *
 Given the available information, it appears that she had an infection most likely the pneumonia by staph, which is a very common cause of production of mucous plugs. * * * (Tr. 1050-1052.)
While plaintiff's expert, Dr. Stauffer, did not believe a mucus plug was "likely to have been present," he agreed, during cross-examination, that a mucous plug could obstruct either the upper or lower airway. Dr. Stauffer also acknowledged during cross-examination that, "[i]f there's substantial obstruction of the airway * * * you may not see any clinical improvement." (Tr. 313.) Significantly, Dr. Stauffer conceded that if the clinical presentation for Myrick, at approximately 4:00 p.m., indicated shortness of breath, labored breathing and use of her accessory muscles, such presentation was consistent with a partially obstructed airway. He noted that mucous plugs are transient, and that they can "come and go," and thus may not be detected on x-rays. (Tr. 309.) Dr. Stauffer further stated that he did not know what caused Myrick's respiratory failure on June 21. Plaintiff's other expert witness, Dr. Franklin, stated that, prior to the intubation at issue, Myrick was acidemic, and he could not determine what role that condition played in this case.
Regarding the issue of standard of care, the trial court in its decision cited an article by plaintiff's expert, Dr. Stauffer, admitted as plaintiff's Exhibit No. 8, in which Dr. Stauffer wrote that one of the methods for confirming proper tube placement is a physical examination, whereby the operator should inspect and "auscultate" (examine by listening) the chest for symmetrical expansion and inspiratory airflow. In the article, the author further states that abdominal distention signifies probable esophageal intubation. Dr. Stauffer testified at trial that visualizing the vocal cords provides one of the best assurances for a physician of an esophageal intubation, and he stated that confirmation of the proper placement of the tube is a process rather than just a step. Dr. Stauffer further testified that physicians must trust their clinical judgment in determining whether to transport a patient. Dr. Franklin testified that the standard of care includes "listening to both the lungs, the front and sides, listening to the stomach." (Tr. 460.) The standard of care also includes observing the patient in terms of vital signs.
Defendant's expert, Dr. Allen, testified that the standard of care was met in this case. He stated that the standard of care for intubation requires that a physician have a "reasonable degree of clinical competence that the tube is correctly placed within the trachea." (Tr. 1019.) According to Dr. Allen, the procedures used by a physician to establish that an endotracheal tube is properly placed "would include listening for breath sounds over the chest, both the right and the left anterior or anterior lateral chest, as well as listen over the epigastrium * * * in the upper part of the stomach." (Tr. 1019.) As previously noted, Dr. Allen stated that clinical improvement "will not necessarily occur whether the tube is placed or not" depending on "the cause of the respiratory failure." (Tr. 1020.) Dr. Allen agreed with portions of Dr. Stauffer's article on airway management (plaintiff's Exhibit No. 8) as to the standard of care for confirming proper tube placement. Specifically, Dr. Allen agreed that physical examination is the standard of care, and that radiographic testing is often necessary to confirm physical examination.
At trial, Dr. Allen recounted Myrick's extensive medical history, including her malignant thymoma, the removal of her left lung, and her progressive respiratory failure. Dr. Allen described the patient's chronic respiratory failure as characterized by intermittent shortness of breath, intermittent tachypnea (a rapid respiratory rate) and an elevated carbon dioxide level.
Dr. Allen opined that the doctors in the medical step-down unit "acted within the generally accepted standard of care for resuscitating a patient with respiratory failure." (Tr. 1045.) His opinion was based on the deposition testimony of the treating physicians, including testimony indicating that the doctor performing the intubation visualized the patient's vocal cords, that adequate breath sounds were heard over the patient's chest, and that the patient was stabilized prior to being transferred to the intensive care unit. He also noted that the depositions of the three physicians in the medical step-down unit at the time of the intubation all indicated that the patient was checked for sounds not only over the chest area but also over the epigastrium. Finally, Dr. Allen opined that the actions of defendant's agents in the medical step-down unit did not proximately cause Myrick's death.
In the present case, the evidence presented, including the testimony of defendant's medical expert, provided a basis upon which the trial court could have concluded that defendant's agents did not deviate from the applicable standard of care. Although there was conflicting evidence as to the issue of whether the actions of defendant's agents measured up to the applicable standard of care, it was within the province of the trier of fact to weigh the medical testimony and to resolve the conflicting opinions. Because there was competent, credible evidence to support the trial court's decision, we will not disturb the court's judgment as being against the weight of the evidence.
Plaintiff's first assignment of error is without merit and is overruled.
Under the second assignment of error, plaintiff argues that the trial court erred in admitting the testimony of one of defendant's witnesses, Dr. Robert Baughman. Specifically, plaintiff contends that Dr. Baughman was not qualified to testify as an expert under Evid.R. 601(D).
Evid.R. 601(D) limits testimony on the issue of liability in a medical claim to a person "licensed to practice medicine and surgery * * * by the state medical board or by the licensing authority of the state" and who "devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure * * *." In general, "[t]he purpose of the competency requirements of Evid.R. 601(D) is to insure that a person who offers an expert opinion on the issue of liability in a medical malpractice claim is fit by experience to do so." Fahey v. Abouhossein (Feb. 12, 1999), Montgomery App. No. 17215, unreported. Further, "[t]he experience required by Evid.R. 601(D) insures that the witness has some actual knowledge of the daily care of patients, which is the particular foundation that qualifies a witness to opine whether an action by a treating physician deviated from the standard of conduct that his duty of care imposed, the predicate basis for liability in a claim of medical malpractice." Id.
Plaintiff does not dispute that Dr. Baughman testified at trial that he devoted one-half of his professional time to clinical practice. However, plaintiff argues that, at no time during his testimony was Dr. Baughman ever asked, nor did he ever specify, whether he was licensed to practice medicine.
We note that plaintiff failed to raise an objection regarding Dr. Baughman's competency at the time of his testimony. Rather, plaintiff first raised this issue at the close of defendant's case. Counsel for plaintiff made a motion to strike Dr. Baughman's testimony because he was never asked during his testimony whether he was licensed. Counsel for plaintiff noted that, "[i]t may seem like a technicality, but I'm making that motion on the record." (Tr. 1115.)
We find no abuse of discretion by the trial court in failing to strike the testimony of the witness. At trial, Dr. Baughman testified that he is a specialist in pulmonary and critical care at the University of Cincinnati Hospital, and that, at times, he serves as the attending physician in the hospital's medical intensive care unit. Although Dr. Baughman was not specifically asked during his testimony whether he was licensed to practice medicine, one of the exhibits admitted at trial includes Dr. Baughman's curriculum vitae, which provides that he is licensed to practice medicine in both Ohio and Indiana. Thus, there was evidence before the trial court that Dr. Baughman met both of the requirements under Evid.R. 601(D).
Finally, the record indicates that, during Dr. Baughman's direct examination, counsel for defendant never asked this witness an opinion question on the issue of liability. Rather, Dr. Baughman, who was a treating physician of Myrick, was primarily questioned about Myrick's underlying respiratory condition and the treatment she received at the hospital for that condition, while defendant's expert, Dr. Allen, provided opinion testimony on the question of liability. In fact, the record indicates that counsel for plaintiff, during cross-examination, propounded the only questions to Dr. Baughman regarding the issue of standard of care. Thus, even assuming that Dr. Baughman had not been properly qualified under Evid.R. 601(D), plaintiff would be unable to show prejudice based on the record in this case.
Plaintiff's second assignment of error is without merit and is overruled.
Based upon the foregoing, plaintiff's first and second assignments of error are overruled and the judgment of the trial court is hereby affirmed.
TYACK and McCORMAC, JJ., concur.
McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.