DECISION AND JUDGMENT ENTRY
{¶ 1} This cause comes on appeal from the Huron County Court of Common Pleas, upon a jury verdict rendered in favor of appellees, Dr. James Gottfried, and his employer, The Norwalk Clinic, Inc. Appellant, Dian Gerke, filed the instant action alleging that Dr. Gottfried was medically negligent for failing to properly advise her and failing to follow her progress after test results in 1999 showed the presence of an ovarian cyst, which, she alleged, later developed into a harmful cancer first diagnosed in late 2002. Appellant timely appealed the jury's verdict and raises four assignments of error for review:
 {¶ 2} "First Assignment of Error: The trial court erred in failing to instruct the jury as appellant requested per proposed jury instructions No. 15, 16, and 17.
 {¶ 3} "Second Assignment of Error: The trial court erred by instructing the jury as to remote cause.
 {¶ 4} "Third Assignment of Error: The verdict and interrogatory finding no negligence is contrary to the manifest weight of the evidence.
 {¶ 5} "Fourth Assignment of Error: The trial court erred granting [sic] appellee's motion in limine and excluding evidence regarding appellee's failure to follow up on the ovarian cyst discovered in 1988."
 {¶ 6} The thrust of appellant's case at trial was demonstrating that appellees failed to properly follow or advise Dian regarding an ovarian cyst detected by CT scan in November 1999, and that that cyst later became a malignant tumor first discovered in October 2002. The following relevant testimony and evidence is a composite of that offered at trial.
 {¶ 7} Each physician gave substantially similar explanations of ovarian cysts and methods of detection. Generally, an ovarian cyst is a fluid-filled collection adjacent to or inside of an ovary. In lay terminology, it appears as a balloon filled with water on an imaging test. Ovarian cysts may be benign or cancerous; the more solid the cyst, or the more solid matter it contains, the more likely it is cancerous. Several physicians testified that 99 to 99.9 percent of ovarian cysts are water-filled and benign. The probability of cancer also rises with the size of the cyst. Even cysts that appear on imaging tests to be completely water-filled may contain a cancer cell which may later develop into a malignant mass; only by removing the cyst for examination by a pathologist could a physician determine whether a cyst contained a cancer cell. Benign, or "functional" cysts are common in menstruating women; functional cysts will resolve naturally through the menstrual cycle and disappear. If unseen cancer cells are present, the cyst will tend to persist instead of resolving through the menstrual cycle.
 {¶ 8} Dian's medical history with the Norwalk Clinic and Dr. Gottfried began in 1988, when she visited the emergency room for sudden abdominal pain. Dr. Medvedeff, the attending physician, diagnosed pelvic inflammatory disease, after performing, inter alia, a pelvic exam and ordering a pelvic ultrasound. The ultrasound revealed an ovarian cyst measuring 3.3 centimeters; Dr. Medvedeff had been unable, upon manual manipulation of Dian's ovaries, to feel the cyst. Dian was instructed to call Dr. Gottfried's office for the ultrasound results. Dr. Gottfried testified that he thought the cyst was functional, or disappearing, because she was pre-menopausal and regularly menstruating. He instructed Dian to call for an appointment if any pain persisted; Dian also testified that Dr. Gottfried told her to call only if she had continuing pain.
 {¶ 9} Appellant's expert, Dr. Hanjani, a gynecological oncologist, chief of division gynecologic oncology at Abington Memorial Hospital and professor of gynecology and obstetrics at Temple University School of Medicine, opined that the cyst most likely was undetectable by pelvic examination because it was no larger than 3.3 centimeters, and agreed that it was most likely functional and would have disappeared on its own at the beginning of Dian's next menstrual cycle.
 {¶ 10} Deborah Summers, a physician's assistant at the Norwalk Clinic, trained and qualified to administer pelvic exams, explained the process of a pelvic exam and what medical practitioners look for. The cervix and uterus are manipulated by hand, to feel uterine size, ascertain whether it is "movable and non-tender," and feel the ovaries. With respect to the ovaries, she testified that she was able to feel ovarian cysts manually in prior training and in her practice. A PAP test, usually performed incident to a pelvic exam, involves taking tissue samples from the outside and inside of the cervix, which are evaluated for abnormal cervical cells.
 {¶ 11} Summers usually saw Dian at her visits to the Norwalk Clinic; Dr. Gottfried was her supervising physician. Reading from Dian's chart, Summers noted that Dian called in July 1988 and reported irregular menstrual bleeding. Soon afterwards, Dian began taking Prempro, a hormone replacement which suppresses ovulation and is usually given to menopausal women. In August 1999, Summers gave Dian a pelvic exam and noted that Dian had not menstruated since starting Prempro. One month later, in October 1999, Dian reported symptoms of a "pulling or tearing" sensation, and requested a referral to a general surgeon regarding a possible hernia; no symptoms were recorded in her chart from the August 1999 visit.
 {¶ 12} The physician to which Dian was referred ordered an abdominal CT scan. Dr. Gutowicz, a radiologist, read the scan and reported a 4.3 centimeter cyst on Dian's left ovary which, he reported, was "probably benign." He explained that although the cyst had no solid component, he could not say for certain whether the cyst may be cancerous because of the small chance it contained a cancer cell. No hernia existed, the CT scan was sent to the Norwalk Clinic, and Dian was told to follow-up with Dr. Gottfried.
 {¶ 13} When Dian saw Dr. Gottfried on November 15, 1999, she still complained of pelvic pain, specifically in her left lower abdomen. Dr. Gottfried manually palpated Dian's pelvic area, but did not try to feel the ovarian cyst because, he explained, the CT scan had already detected it, and he was feeling for different sources of the abdominal pain. Dr. Gottfried prescribed Celebrex, an anti-inflammatory drug because he thought her pain was muscular. With respect to the CT scan, he testified that he specifically remembered reviewing the results with her although he did not note her chart to that effect. He testified that he told Dian that the cyst should be followed and that she should schedule a follow-up appointment in January. He charted "pelvic in Jan."
 {¶ 14} Dian did not return in January for an appointment, although chart notes indicate she called several times in December and January for non-gynecological reasons. Neither does any note from Norwalk Clinic staff indicate that Dian was reminded of the need for a follow-up visit. Summers explained that patients are giving a billing statement after their visit was completed; the statement contains a space where doctors and assistants can write a diagnosis, patient instructions, and when another appointment should be scheduled according to the doctor's orders. No instructions or appointment date were written on Dian's statement on November 15; Summers and Dr. Gottfried explained that they would only use the space to write instructions if they thought it was necessary, depending on the conversations with the patient.
 {¶ 15} Dian testified that Dr. Gottfried told her that the CT scan showed an ovarian cyst, but he did not tell her she had to return in January for a pelvic exam or that it was necessary to follow the progress of the cyst. She said Dr. Gottfried never suggested the possibility that the cyst may be cancerous, and that until her cancer was later diagnosed in late 2002, she thought that all ovarian cysts "just passed through you" and never became cancerous.
 {¶ 16} Dian was next seen at the Norwalk Clinic by Summers in August 2000, for an annual pelvic exam. Summers performed the pelvic and a PAP test, and testified that the pelvic was normal and Dian reported feeling fine. However, the PAP test showed some atypical cervical cells, and Dian was instructed to have another PAP test in three to six months. Summers testified that her usually practice was to discuss results with the patient, which would have included the results of the November 1999 CT scan; however, no notation to that effect was charted.
 {¶ 17} In October 2001, Summers gave Dian another annual pelvic exam and PAP test. Upon physical manipulation, Summers charted that Dian's ovaries were "normal"; however, the PAP test again showed abnormal cervical cells. Dian was notified of the results and again instructed to repeat a PAP test in three to six months. Instead, Dian asked for and received a referral to Dr. Sherry Jones, a gynecologist in private practice.
 {¶ 18} Dr. Jones saw Dian in November 2001 and performed a colposcopic examination; this exam consists of visualizing the cervix, painting the cervix with acetic acid, then visualizing the cervix with a colposcope and obtaining "curettings." She did not perform a pelvic exam or manually palpate Dian's ovaries since, she explained, her usual practice was to only do a colposcopy after a patient is referred for two abnormal PAP tests. Dr. Jones was not notified, either by Dian, the Norwalk Clinic, or Summers, of the November 1999 CT scan detecting an ovarian cyst. Dr. Jones instructed Dian to return in six months for a follow-up.
 {¶ 19} At that next visit, in May 2002, Dr. Jones noted the colposcopy results were negative, or normal. She performed a pelvic exam and PAP test; upon manual palpation, she noted no enlargement or abnormality of Dian's ovaries. She estimated Dian's uterus to be "six to eight weeks' size and mobile." Later testimony established that the measure of uterine size by "weeks" refers to the size a uterus would be at that point during gestation. Dr. Jones instructed Dian to return in six months for another PAP test.
 {¶ 20} Instead, Dian received her next pelvic exam and PAP test from the Norwalk Clinic in early October 2002. Summers noted that, upon physical manipulation, Dian's left ovary was enlarged and tender, but noted nothing abnormal on Dian's right ovary. She also noted that Dian reported no "problems" with symptoms; however, Dian testified that she returned to the Norwalk Clinic because of bloating, accidental urination, and "bright orange discharge." In response to the abnormally enlarged ovary, Summers scheduled Dian for a pelvic ultrasound on October 23, 2002, and referred Dian back to Dr. Jones.
 {¶ 21} Dian returned to Dr. Jones on October 29, 2002. Testifying from her notes, Dr. Jones read the radiologist's report of the ultrasound, which found Dian's left ovary enlarged to three times the size of the right ovary, a mass on the left ovary, and several "small" cysts on the right ovary. The right ovary measured 6.8 cubic centimeters, but the left ovary measured 258 cubic centimeters. Dian reported fatigue, and Dr. Jones noted Dian said, "feels like burst Saturday. Orange discharge since." Upon bi-manual palpation of the ovaries, Dr. Jones was able to feel left ovarian mass. Dr. Gutowicz, the radiologist, also read this ultrasound and reported that the left ovary's mass was complex (containing both solid and fluid components) which could be either "cystadeoma or a cystadenocarcinoma." The first is a benign tumor; the second contains malignant cells. He could not tell from the scan whether the mass was benign or malignant. In a letter to the Norwalk Clinic dated October 31, 2002, Dr. Jones wrote, "This mass had not been found at the time of examination here in May of 2002." Dr. Jones had a consultative appointment with Dian on November 5, 2002, and referred Dian to Dr. Zanotti of the Cleveland Clinic, as she did other oncological patients.
 {¶ 22} Dr. Zanotti performed a complete hysterectomy, and the post-surgical report read relevantly as follows: "Left ovary, excision (A) — metastatic poorly differentiated adenocarcinoma. * * * Left perioaortic lymph node, excision (E) — metastatic adenocarcinoma. Periaortic lymph node, excision (F) — metastatic adenocarcinoma." According to Dr. Jones' testimony, this type of cancer was extremely aggressive and had developed rapidly.
 {¶ 23} Appellant's expert witness, Dr. Hanjani, testified to the relevant standard of care. First, he testified that the standard of care with respect to ovarian cysts for a general practitioner is equivalent to the standard of care for a gynecologist. He explained that there were three ways an ovarian cyst could be diagnosed: a pelvic exam, an ultrasound, and a CT scan. Neither an ultrasound nor CT scan will definitively determine whether a cyst contains a cancer cell, for the reasons explained by Dr. Gutowicz. Once a cyst has been identified by imaging test, another imaging test must be done within six to 12 weeks to see whether the cyst has disappeared or is "present and persists." Dr. Hanjani stated he recommends that any cyst that persists be removed, even if it appears to be a simple cyst. Because over two-thirds of ovarian cancer cases are fatal, no abnormality on an ovary should be ignored, he explained. A large percentage of ovarian cancer cases are fatal because over 75 percent of cancerous cysts are not diagnosed until the cancer is in an advanced stage. He also testified that a pelvic exam is the least accurate method in diagnosing cysts; CT scans are more accurate than pelvic exams, and ultrasounds are the best imaging method.
 {¶ 24} As for the CT scan performed in November 1999, which was 4.3 centimeters and labeled "probably benign," Dr. Hanjani opined that the chances of the cyst being functional and resolving through the menstrual cycle were low, as Diane was 45 years old, having irregular bleeding and taking medication which suppressed ovulation. With respect to the standard of care to be followed when informing Diane of the importance of follow-up care, he opined that "it's very important when you see a patient like Mrs. Gerke that to explain [sic] to them why it's important to be followed. That is you have to tell the patient that she has a cyst on her ovary. The cyst may not be cancer, but it's possible to be cancer, and we have to repeat the test, and then patient given appointment to see she comes back [sic]." He reiterated that if Dr. Gottfried failed to inform Diane of a risk of the cyst being cancerous, his action did not conform to the standard of care.
 {¶ 25} He stressed that a pelvic exam would only detect a cyst of this size in 75 percent of cases. Thus, in his opinion, it was more likely than not that the cyst detected in November 1999 was still present and undetected during Diane's August 2000 pelvic exam. Ultimately, he opined that the mass surgically removed in 2002 was most likely the same cyst that was originally detected by CT scan in November 1999, and that the failure to properly follow the cyst identified in 1999 resulted the cyst developing into ovarian cancer. In his opinion, if an ultrasound had been performed in January of 2000, it would have shown that the cyst persisted, and he would have removed the ovary. As for Dr. Jones' pelvic exam in May 2002 which Dr. Jones characterized as "normal," Dr. Hanjani said that, in his opinion, Dr. Jones simply did not feel the mass which must have been present and developing since November 1999, since pelvic exams have a low frequency in detecting cysts. Dr. Hanjani also testified that a uterus size of "six to eight weeks" in a non-pregnant woman of Dian's age was not a "normal" finding, disagreeing with Dr. Jones' characterization of the May 2002 pelvic exam. He also acknowledged, however, that patients may receive good medical care and still develop ovarian cancer which is not diagnosed until it is in the later, most harmful stages.
 {¶ 26} Dr. Andrews, appellees' expert witness and a gynecologic oncologist at the Medical College of Ohio, explained CT scan images of Dian's 1999 cyst. He described the cyst as a small, thin-walled balloon filled with fluid and concluded it was functional, specifically, a normal part of the ovarian cycle. He stated that probably 95 percent of ovarian cysts of this size "resolve spontaneously." With respect to the CT image taken in October 2002, he described the left ovarian mass as "probably something bad. This is one that we would pretty immediately bring the woman into the operating room to remove it surgically to find out what it is." He then opined that the 1999 cyst was a completely separate structure from the 2002 mass, and that the 2002 mass had not developed from the 1999 cyst. If the 1999 cyst was not a functional cyst, then he would have expected any mass resulting from it to have been much larger and more easily felt than the mass discovered in 2002, because the type of cancer was fast-growing and aggressive. Moreover, the May 2001, October 2001, and May 2002 exams were consistent with his conclusion that the 1999 cyst disappeared through the normal ovarian cycle and the mass detected in 2002 was unrelated. He also agreed with Dr. Jones that the May 2002 finding that Dian's uterus was "six to eight weeks" in size was normal for a woman of Dian's age who had three children, directly contradicting Dr. Hanjani's opinion.
 {¶ 27} Most relevantly, Dr. Andrews testified that the manner in which Dr. Gottfried and the Norwalk Clinic treated the cyst discovered in 1999 was within the accepted standard of care of a family practice physician based on the CT scan image. He also testified that, had another CT scan been performed in January, as Dr. Gottfried testified he instructed Dian to do, that it the cyst would most likely have not persisted but would have resolved on its own, as it was most probably functional.
 {¶ 28} He did agree, however, with appellant's expert witness in that the pelvic exam is not a good screening test for ovarian cancer, because it usually detects an ovarian mass in an advanced stage, when the five-year survival rate is about 20 percent. He agreed that a woman should be informed of the risks associated with any persistent cyst, and be informed that they have a right to elect to not have it surgically removed or to have it surgically removed, and that any cyst, even simple ones, should be followed to ascertain growth so it could be surgically removed. He also agreed that, under the standard of care, Dr. Gottfried had a duty in November 1999 to tell Dian the full contents of the radiological report, explain that the cyst was probably benign but that a chance of malignancy existed, and that it must be monitored with a repeat imaging test in 6 to 8 weeks. He also stated that if Dr. Gottfried had not told Dian in November 1999 to follow up, or the reasons why follow up was necessary, that it would be below the standard of care.
 {¶ 29} Dr. Gottfried testified that he shared the initial CT scan from November 1999 with Dian, including the radiologist's report that the cyst was "probably benign." When asked on cross-examination why he did not tell Dian outright of the possibility that the cyst detected in November 1999 could be cancerous the following exchange occurred:
 {¶ 30} "Q. * * * Now, you agree that when she came in to you for follow-up you had a duty to advise her of the nature of the findings on that CT, correct?
 {¶ 31} "A. Correct.
 {¶ 32} "Q. You agree that she had a right to know what the findings were and the significance of the finding?
 {¶ 33} "A. That's correct.
 {¶ 34} "* * *
 {¶ 35} "Q. I want to know if you would agree that she had a right to know that while the radiological thought the mass was benign that it might be cancerous, do you agree with that? A little bit different question.
 {¶ 36} "A. No, I don't. I think when that was the first time that she had cyst, it's like when I see a child in the office for an ear infection or if you see one with bronchitis, and I ask them for follow-up, I do not tell them cancer to have them come back. I tell them bronchitis or they have an ear infection. I think telling someone that it's benign, most likely a benign cyst, is probably adequate. I do not think I have to tell them that it could be cancer."
 {¶ 37} At the close of appellant's case, the Norwalk Clinic moved for a directed verdict, which was granted as to all claims except for its vicarious liability for Dr. Gottfried's actions. Dr. Gottfried also moved for directed verdict, based on a lack of proximate causation, which was denied. The remaining claims were submitted to the jury; in its answers to interrogatories, it unanimously found no negligence on the part of the Norwalk Clinic and Dr. Gottfried. After trial, the court, by entry, denied appellant's motion for a new trial, and granted appellees' motion in limine to exclude "evidence, argument or reference of any kind to any alleged negligence concerning the manner in which Dr. Gottfried managed the left ovarian cyst diagnosed" in 1988.
I. Motion in Limine
 {¶ 38} To facilitate analysis, we address appellant's assignments out of order. First, appellant argues that the trial court should have permitted testimony regarding the manner in which Dr. Gottfried treated Dian's cyst discovered in 1988. Specifically, she argues that it is relevant as indicative of the manner in which Dr. Gottfried routinely treated ovarian cysts — to instruct a patient to return for further testing only if pain persisted, failing to stress to a patient that any cyst must always be followed because of the risk, however slight, of cancer. Since appellant was told in 1988 that she need only follow-up if she experienced persistent pain, appellant argues that it is then both more likely that appellees followed a similar course of treatment for the 1999 cyst, and more likely that appellant believed a follow-up for the 1999 cyst was necessary only if she experienced continuing pain.
 {¶ 39} In response, appellees note that the trial court only excluded testimony that Dr. Gottfried's management of the 1988 cyst was negligent. Indeed, much testimony from several witnesses concerned the existence and treatment of the 1988 cyst. Dr. Medvedeff, the emergency room physician who attended to Dian in 1988, testified to that event via deposition transcripts. The only testimony stricken during trial concerned appellant's expert witness, Dr. Hanjani. Appellant's counsel stipulated to Dr. Gottfried's motion to strike Dr. Hanjani's testimony that the 1988 cyst should have been followed. The trial court instructed the jury to disregard Dr. Hanjani's reference to the 1988 cyst, with no objection from appellant's counsel. Appellees also argue that such evidence would have been unfairly prejudicial or confusing and misleading pursuant to Evid.R. 403(A). Finally, appellees argue that the evidence was properly categorized as "other acts" evidence and barred pursuant to Evid.R. 404(B).
 {¶ 40} A motion in limine is designed "to avoid the injection into a trial of a potentially prejudicial matter which is not relevant and is inadmissible." Reinhart v. Toledo Blade Co.
(1985), 21 Ohio App.3d 274, 278. To be relevant and therefore admissible, evidence must have a tendency "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Even if evidence is relevant, however, it must be excluded under Evid.R. 403(A) "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."
 {¶ 41} Appellant's arguments fail to distinguish between habit, or custom, and a prior act. When appellant asserts that Dr. Gottfried's treatment of her cyst in 1988 is relevant insofar as it tends to make the alleged negligence in 1999 more probable, she is alleging that his practice in 1988 was habitual. Evid.R. 406 allows admission of evidence demonstrating the "habit of a person or of the routine practice of an organization," in order to prove that "the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." Evid.R. 404(B) bars admission of evidence of a prior act in order to show "character" and action "in conformity therewith."
 {¶ 42} "The rationale for the admission of evidence of habit pursuant to Evid.R. 406 is that habitual acts may become semiautomatic and may tend to prove that one acted in the particular case in the same manner. Cardinal v. Family Foot CareCenters, Inc. (1987), 40 Ohio App.3d 181; Bradley v. FarmersNew World Life Ins. Co. (1996), 112 Ohio App.3d 696. In order for evidence of habit to be admissible, it must establish a regular or routine practice. Evidence as to one or two isolated occurrences does not establish a sufficient regular practice for admission pursuant to Evid.R. 406." Bollinger, Inc. v. Mayerson
(1996), 116 Ohio App.3d 702, 715, citing Cannell v. Rhodes
(1986), 31 Ohio App.3d 183; Bolan v. Adams (1984),19 Ohio App.3d 206.
 {¶ 43} Here, appellant attempts to use a single act — Dr. Gottfried's treatment of the 1988 cyst and his instructions to Dian — in order to show that Dr. Gottfried acted similarly in 1999 and similarly instructed Dian. Use of evidence in this manner falls underneath the bar set by Evid.R. 404(B). The 1988 treatment is a single occurrence, and does not establish a regular practice as required by Evid.R. 406. Bollinger, Inc.,
supra. Any relevance is outweighed by possible prejudice. Moreover, only appellant's expert's testimony characterizing the 1988 treatment as negligent was limited; the jury heard extensive testimony describing the 1988 event. Appellant's fourth assignment of error is not well-taken.
II. Jury Instructions
 {¶ 44} Under her first assignment of error, appellant argues that the trial court incorrectly refused to instruct the jury with respect to a physician's duty to notify a patient of test results and a physician's duty to properly instruct a patient, pointing to three of her proposed jury instructions. Appellant proposed instructions as follows:
 {¶ 45} "A treating physician is obligated to inform a patient of the results of diagnostic tests, the importance of follow-up care or testing, if any, and the options of treatment so that the patient can make an intelligent decision regarding the course of treatment. This duty to disclose arises as a matter of law from the patient-physician relationship.
 {¶ 46} "Patients have a right to know the results of any tests performed on them and the significance of any tests results [sic]. The responsibility of advising Dian Gerke of the results of the CT scan performed on November 9, 1999 and the need for follow up belonged to Dr. Gottfried.
 {¶ 47} "The plaintiff and the defendant agree that when a CT scan showed what was identified as a cyst on the plaintiff's left overy [sic] in November of 1999, the accepted standard of care was to advise the patient of the findings of the CT scan and the need for follow-up to make certain that the mass was not cancerous. In this case, the duty to advise the plaintiff of the results of the CT scan and the reason and importance of the follow-up care was on Dr. Gottfried and the Norwalk Clinic. If you find from the greater weight of the evidence that Dr. Gottfried and/or other Norwalk Clinic personnel failed to adequately advise the plaintiff of the results of the CT and/or the importance of follow-up or failed to properly follow the plaintiff, you must find Dr. Gottfried and the Norwalk Clinic negligent."
 {¶ 48} "A single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge." State v. Price (1979), 60 Ohio St.2d 136, paragraph four of the syllabus, following Cupp v. Naughten
(1973), 414 U.S. 141, 146-147. However, an incomplete jury instruction will constitute grounds for reversal of a judgment where the charge as given misleads the jury. See Columbus Ry.Co. v. Ritter (1902), 67 Ohio St. 53. A jury instruction "should also be adapted to the case and so explicit as not to be misunderstood or misconstrued by the jury." Marshall v. Gibson
(1985), 19 Ohio St.3d 10, 12, citing Aetna Ins. Co. v. Reed
(1878), 33 Ohio St. 283, 295. "An inadequate jury instruction that misleads the jury constitutes reversible error." Groob v.KeyBank (2006), 108 Ohio St.3d 348, 355. Additionally, the jury must have been misled to the prejudice of the party seeking reversal. Laverick v. Children's Hosp. Med. Ctr. of Akron, Inc.
(1988), 43 Ohio App.3d 201, 202.
 {¶ 49} The trial court gave a general instruction as to the standard of care: "The existence of a physician-patient relationship imposes on the physician the duty to act as would a physician of ordinary skill, care and diligence under like or similar conditions or circumstances. The standard of care is to do those things which such a physician would do and to refrain from doing those things which such a physician would not do. A physician that diagnoses and treats a gynecological problem is held to the same standard of care as a reasonably competent physician who diagnoses and treats such problems irrespective of whether the physician is a family practice physician or a specialist in gynecology. If you find by the greater weight of the evidence that Dr. Gottfried failed to use that standard of care, then you must find that Dr. Gottfried and the Norwalk Clinic were negligent."
 {¶ 50} Appellant contends that her first proposed jury instruction contains the law related to a physician's standard of care as set forth in Bruni v. Tatsumi (1976),46 Ohio St.2d 127. However, the trial court's instructions recited the same essential kernel of law from paragraph one of Bruni's syllabus:
 {¶ 51} "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things."
 {¶ 52} Appellant also argues that all three rejected instructions relate to a physician's duty to disclose diagnostic test results, and it was error for the court to give no instructions at all regarding that duty to inform a patient of test results. In support, appellant cites Turner v. Children'sHosp. (1991), 76 Ohio App.3d 541, and Phillips v. GoodSamaritan Hosp. (1979), 65 Ohio App.2d 112. In Turner, the trial court was found in error when it directed a verdict for the defendant physician, because "patients must be told that which a reasonably prudent physician would disclose. If a doctor knows of a patient's weakened condition, susceptibility to injury, or makes a diagnosis of a disease, and then fails to tell the patient, who later suffers injury or damage because of the lack of such information, then the law holds the physician accountable." 76 Ohio App.3d at 555. Turner also citedFaulkner v. Pezeshki (1975), 44 Ohio App.2d 186 for the proposition that "a physician, upon completion of his services, must give the patient proper instructions to guard against the risk of future harm." Id.
 {¶ 53} In response, appellees argue that if a general instruction adequately covers a subject, then a court does not err in refusing to give specific instructions, citing Echols v.Berney (Apr. 30, 1998), 8th Dist. No. 72314. In Echols, the plaintiff argued for more specific instructions regarding the standard of care, but did not argue that the general instructions given were an incorrect statement of the law. Here, appellant does not argue that the general instruction contained in the first paragraph and the first part of the second paragraph, derived from Bruni, were incorrect statements of law. Appellant argues instead that the general instruction did not cover the "subject area" of the duty to inform of test results. However, appellant testified that Dr. Gottfried had told her that she had an ovarian cyst in November 1999. In urging us to find error, appellant argues that the court should have instructed the jury that Dr. Gottfried had the additional duty to inform appellant that it was due to the possibility of cancer that the cyst required monitoring.
 {¶ 54} Dr. Hanjani testified that the standard of care required Dr. Gottfried to tell Dian in November 1999 (1) that the CT scan showed an ovarian cyst that was "probably benign" (2) that because of a possibility of cancer, (3) Dian should have the test repeated in 6 to 8 weeks. Dr. Andrews agreed with Dr. Hanjani in that the standard of care (1) required Dr. Gottfried to inform Dian in November 1999 of the cyst, (2) required him to inform Dian of the risks associated with the cyst, including the chance a malignancy would develop, (3) required him to inform Dian that the cyst must be followed. Thus, appellant's proposed jury instruction nearly mirrors the standard to which both experts testified.
 {¶ 55} Appellees insist that, when expert witnesses disagree on the standard of care applicable in a medical malpractice case, the jury is free to choose which standard to apply. Appellees assert that Dr. Andrews testified that there is no duty to tell a woman that a cyst may be cancerous. That assertion is belied by the record. On cross-examination, Dr. Andrews replied affirmatively when asked, "So, you would have a duty to explain [to the patient] that the expert radiologist in some terms said [a cyst] is probably benign, but it may not be benign and we have to follow this to make certain that it doesn't grow bigger, because if it does, then it has to be removed, at least that would be my recommendation to you, remove it, because you don't know if this is cancerous, correct?" His testimony was not, as appellees suggested, that a woman only be advised of a potential for cancer when a cyst persists over time. Regardless, it is axiomatic that the court is responsible for instructing the jury as to the applicable law, as the applicable standard of care is not for a jury to resolve.
 {¶ 56} Here, the jury heard both experts testify to "those things which such a physician would do and to refrain from doing those things which such a physician would not do." Since the experts were in essential agreement regarding the standard of care contained in appellant's proposed jury instructions, the jury could not have been mislead, or could appellant have been prejudiced, by the trial court's correct general instruction Appellant's first assignment of error is not well-taken.
 {¶ 57} In her second assignment, appellant claims error in the jury instructions on proximate cause. Specifically, appellant points to the statement: "The test [for foreseeability] is whether under all the circumstances a reasonably careful physician or physician assistant would have anticipated that an act or failure to act would likely cause some injury." Appellant argues that, because the chances were 0.1 percent that an ovarian cyst would develop into a malignancy, defining "foreseeability as probability to cause injury is confusing and misleading." Appellees respond, in part, that the issue is irrelevant because the jury unanimously indicated on the interrogatory that they did not find Dr. Gottfried negligent. The trial court instructed the jury: "If you find that the defendant was negligent, then you will proceed to decide by the greater weight of the evidence whether such negligence was the proximate cause of plaintiff's injury and if so, what is the extent of the damages suffered by her." Thus, the jury was clearly instructed not to reach the issue of proximate cause until and unless they first decided that Dr. Gottfried breached the standard of care. Since the jury found that Dr. Gottfried did not breach the standard of care, if the jury had been misled, the confusion would have arisen with respect to the standard of care; as discussed supra, however, those instructions were proper. Appellant's second assignment of error is not well-taken.
III. Manifest Weight
 {¶ 58} In her third and final assignment of error, appellant disputes both the verdict as against the manifest weight of the evidence, and the denial of her motion for a new trial. The same standard of appellate review applies to both challenges. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley Const. Co. (1978),54 Ohio St.2d 279, syllabus. However, the decision to grant a motion for a new trial pursuant to Civ.R. 59 rests in the sound discretion of the trial court, Sharp v. Norfolk W. Ry. Co. (1995),72 Ohio St.3d 307, 312, and such decisions are not reversible unless an abuse of discretion occurred. Green v. Castronova (1966),9 Ohio App.2d 156, 158. Unless a greater amount of evidence supports a contradictory finding, appellate courts defer to the conclusions of the finder of fact because it is better able than the appellate court "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co., Inc. v. City of Cleveland (1984),10 Ohio St.3d 77, 80.
 {¶ 59} We begin with the jury's interrogatory finding that Dr. Gottfried did not breach the standard of care. The parties focus upon whether Dr. Gottfried, in discussing the first CT scan with Dian in November 1999, should have told her of the possibility that the cyst would persist and develop into a malignancy, and the steps he should have taken to ensure Dian followed through with subsequent appointments. During Dian's appointment in November 1999, Dr. Gottfried noted in Dian's chart "pelvic in Jan." He testified that he would not have made such a notation had he not been simultaneously discussing with Dian the need for her to schedule a follow-up appointment in January to have the cyst re-examined. Dian testified that, although Dr. Gottfried discussed the cyst with her, she was not told to schedule a follow-up appointment, nor was she told the reason why it was important to follow the cyst's progress. Also in evidence was the billing slip/patient instruction sheet, upon which Dr. Gottfried made no notation indicating that Dian should schedule a pelvic exam in January. Appellant asserts that the "entire defense of the case is based upon the note [in Dian's chart] and Dr. Gottfried's claim that he told the Plaintiff to return in January for a pelvic examination."
 {¶ 60} The parties also dispute whether Dr. Gottfried, in explaining the November CT scan results to Dian, should have informed her of the possibility the cyst could become cancerous. As discussed supra, both Dr. Hanjani and Dr. Andrews testified that a physician, in informing a patient of an ovarian cyst, should also inform of the need for follow-up to monitor the cyst's progress and should also inform of the risk for cancer. Appellant points to portions of Dr. Gottfried's testimony in which he clearly states that, although he shared the radiologist's report of the CT scan with Dian, he did not tell her explicitly of the possibility that the cyst could be cancerous. Nor, in his opinion, did he think it was necessary to inform her of the possibility. He stated that if the chances of cancer developing were higher than that posed by what appeared to be a benign cyst, then he would so inform the patient; he reiterated that he did, however, inform Dian that it was important to follow up to monitor the cyst. He did state, however, that he shared the contents of the radiological report indicating the cyst was "probably benign," and said that, if Dian had asked (presumably having been alerted by the term "probably") what the chances for malignancy were, then he would have told her of the 0.1 percent chance: "I'd let the patient bring that up. I wouldn't bring that up." He could not say whether Summers or anyone else at the Norwalk Clinic discussed the need to monitor the November 1999 cyst with Dian; he did not dispute that no further imaging tests were performed on Dian's ovaries until she was diagnosed with ovarian cancer.
 {¶ 61} "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." SeasonsCoal Co., 10 Ohio St.3d at 80, quoting 5 Ohio Jurisprudence 3d (1978) 191-192, Appellate Review, Section 603. Reasonable minds could differ as to whether Dr. Gottfried upheld the standard of care when he discussed the radiological report of the CT scan with Dian and informed her that the cyst was "probably benign." It was within the jury's role as finder of fact to determine whether telling Dian the cyst was "probably benign" included (albeit inferentially and implicitly) a notification to her that there was a possibility of cancer. Additionally, although appellant insisted in her motion for a new trial that appellees had a continuing duty, lasting throughout the term of her relationship with appellees, to impress upon her the need for follow-up on the November 1999 report, there was scant discussion of the length that duty lasted by the parties' experts; the jury could have found that Dr. Gottfried discharged his duty to inform Diane of the need for follow-up on November 15, 1999. While Dr. Gottfried may have been less careful in his charting than is desirable, credibility determinations regarding what was said and what was not said in the examination room between Dr. Gottfried and Dian on November 15, 1999, also fell within the jury's province. Although appellant cites several cases where appellate review has shown a lack of evidence supporting a defendant's verdict in medical malpractice cases, we cannot say that, on these facts, the jury lost its way. The trial court did not abuse its discretion in denying appellant's motion for a new trial, and the verdict was not against the manifest weight of the evidence. Appellant's third assignment of error is not well-taken.
 {¶ 62} The judgment of the Huron County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Huron County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
H. Handwork, J., Pietrykowski, J., Skow, J., Concur.